587 F.2d 602
 199 U.S.P.Q. 705
 DONSCO, INC., trading as John Wright, Inc., a Pennsylvania
Corporation, Appellant and Cross-Appellee,
v.
CASPER CORPORATION, a New York Corporation and Casper
Pinsker, Individually and doing business as Casper
Imports, Appellees and Cross-Appellants.
 Nos. 77-2549, 77-2550.
 United States Court of Appeals,
Third Circuit.
 Argued July 26, 1978.
Decided Oct. 31, 1978.
 
 Manny D. Pokotilow, Caesar, Rivise, Bernstein & Cohen, Ltd., Philadelphia, Pa., for plaintiff-appellant and cross-appellee.
 J. Stokes Adams, III, Hepburn, Ross, Wilcox & Putnam, Philadelphia, Pa., Marie V. Driscoll, Jeffrey W. Herrmann, Rogers, Hoge & Hills, New York City, for defendants-appellees and cross-appellants.
 Before ADAMS, WEIS and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 This case involves a conflict between two merchants dealing in reproductions of a very special type of Americana, mechanical penny banks from the turn of the century. Donsco, Inc. trading as John Wright, Inc. (Donsco) brought this action against Casper Corporation (Casper), Casper Pinsker (Pinsker) individually and Casper Pinsker doing business as Casper Imports, alleging that defendants have committed acts of unfair competition and false advertising. The district court below found that Casper Corporation had committed such acts and awarded Donsco $62,500 in damages as well as certain injunctive relief. Casper Pinsker was, however, held not to be personally liable. John Wright, Inc. v. Casper Corp., 419 F.Supp. 292 (E.D.Pa.1976). Both parties raise a series of objections to various aspects of the district court's decision. We will affirm the district court's finding of Casper Corporation's liability for unfair competition and false advertising. We will affirm as well the district court's refusal to allow counsel fees to Donsco and its refusal to hold Casper Corporation in contempt of the district court's injunction. We will reverse the district court's holding that Casper Pinsker is not individually liable for the wrongful acts involved here and we will remand to the district court for more specific findings as to damages.
 
 I. FACTUAL BACKGROUND
 
 2
 In 1869 some enterprising entrepreneur (or perhaps doting grandfather) obtained the first patent on a cast-iron mechanical penny bank. Although this initial bank had only a simple balance mechanism, its progeny incorporated a variety of fancy and fanciful balance and spring devices. In the half-century after the first mechanical bank was patented, approximately 250 different models were made. Original penny banks from this era are now collectors items.
 
 
 3
 Beginning in 1957, pursuant to a promotional scheme conceived by a Mr. Lee Howard in cooperation with the Grolier Society, Inc., the publishers of The Book of Knowledge encyclopedia, a collection of original penny banks was assembled and replicas were made from the originals. The replicas were sold with a Certificate of Authenticity signed by Ellen V. McLoughlin, then Editor-in-Chief of The Book of Knowledge. That certificate read as follows:
 
 
 4
 This mechanical coin bank is an authentic reproduction of the original antique in the collection of The Book of Knowledge. The very same processes and technique which created the original have been employed in the making of this fine reproduction. Molds were painstakingly made from the original bank, handcast in sand, and this reproduction then hand-assembled and hand decorated.
 
 
 5
 Therefore, it is much more than merely a coin bank more than a toy. It is a replica of a product of ingenuity and craftsmanship. It is, indeed, a collector's item with historical interest and value.
 
 
 6
 Treasure it!
 
 Ellen V. McLoughlin
 Editor-in-Chief
 The Book of Knowledge
 
 7
 In 1960, Howard's rights in connection with what came to be known as The Book of Knowledge Collection were sold to the Grey Iron Casting Company of Mt. Joy, Pennsylvania which had been making the replicas. John Wright, Inc. purchased Grey Iron in 1967. Donsco, Inc., a holding company, took over John Wright, Inc. in the early 1970's. With Grolier's tacit consent, the replicas continued to be sold under The Book of Knowledge name and the Certificate of Authenticity continued to be used even though Ellen V. McLoughlin was no longer editor of The Book of Knowledge and The Book of Knowledge Collection was no longer under the ownership of any one person or entity some banks are still owned by Grolier, others may be viewed at the Perelman Toy Museum in Philadelphia, Pennsylvania.
 
 
 8
 Until 1973, Donsco had only one competitor in the mechanical penny bank reproduction market. In 1972, Casper Pinsker and three others formed Casper Corporation to manufacture and market penny banks. After an abortive attempt to have copies made by a Japanese manufacturer, arrangements were made for manufacture in Taiwan. These banks were first marketed, in January 1973, at a trade show under the name of a middle level retailer. Later in 1973, Casper began a direct mail-order campaign under the name "Casper's Collector's Society." Casper commissioned Richard Buehrer to design a certificate of authenticity for its banks. Pinsker gave Buehrer background material including a catalogue in which The Book of Knowledge Certificate of Authenticity was reproduced.
 
 
 9
 The resulting certificate used by Casper in the marketing of its penny banks contained the following text:
 
 
 10
 The mechanical coin bank accompanied by this certificate is an exact and authentic duplicate reproduction of the original antique. Your mechanical coin bank will bear objective comparison with originals in museums and banks of record described in collector's references and in "Old Penny Banks," Library of Congress Catalog Card No. 60-13061.
 
 
 11
 It is further certified that the same techniques, processes and skills were used in making this fine replica. Molds were skillfully made by professional craftsmen like the originals and then hand-cast, after which this bank was assembled and carefully decorated by hand. It was then tested and inspected to be certain it is in good working order and free of flaws and defects often found in cast metal.
 
 
 12
 It is, furthermore, more than a mere toy coin bank, it is a true replica of the skill and ingenuity of the late 19th Century and truly a treasured collector's item of considerable historical value and interest.
 
 Casper's
 Collector's Society
 II. CASPER'S LIABILITY
 
 13
 The district court concluded that although Donsco holds no trademark for its Certificate of Authenticity, that certificate constitutes "trade dress" and is protected against imitation under Pennsylvania's law of unfair competition. To make out a claim for unfair competition, the two central elements are secondary meaning (that the certificate of authenticity is associated in the public's mind with The Book of Knowledge Collection) and likelihood of confusion. The district court found that Donsco's "long, intensive, exclusive, and highly-publicized use and promotion of its Book of Knowledge-endorsed certificate of authenticity between the years 1957 and 1972 created a secondary meaning for that certificate . . . ." John Wright, supra, 419 F.Supp. at 318. The district court also found a likelihood of confusion relying on the degree of similarity between the two certificates, Casper's intent in using the certificate, the comparative use and marketing of the two certificates and the degree of care likely to be used by purchasers. John Wright, supra, 419 F.Supp. at 319-20, citing to Section 729 of the Restatement of Torts as cited in Goebel Brewing Co. v. Esslinger's Inc., 373 Pa. 334, 95 A.2d 523 (1953). The court also considered evidence of actual confusion including unsolicited letters to Donsco from shop owners and customers "asking if (or assuming that) Casper banks, advertised as 'certified, authentic' replicas with a certificate of authenticity (but with no manufacturer's name given), are (Donsco's) banks." John Wright, supra, 419 F.Supp. at 321. There was also evidence that copywriters writing advertisements for Casper banks mistakenly included copy relating to The Book of Knowledge in its copy. Id. at 322.
 
 
 14
 The district court further found that section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), was violated by Casper's use of its certificate because such use amounts to a "false designation of origin" in that customers are deceived into believing that Casper's banks are made by Donsco. The court also found that Casper violated 43(a) in that it committed several acts of false advertising.
 
 
 15
 There is sufficient evidence in the record to support the factual findings made by the district court and we conclude, therefore, that those findings are not clearly erroneous. Furthermore, the district court made no errors of law in concluding on the basis of these factual findings that Casper Corporation had committed acts of unfair competition and false advertising. Therefore we hold that the district court did not err in finding Casper Corporation liable for acts of unfair competition and false advertising.
 
 III. PINSKER'S PERSONAL LIABILITY
 
 16
 We will now examine the district court's conclusions as to the personal liability of Casper Pinsker. This action was brought against Casper Corporation and Casper Pinsker individually and doing business as Casper Imports. The district court held that only Casper Corporation is liable for the damages assessed. The court found that Casper Imports which it referred to as Casper Pinsker's "corporate alter ego" was "completely divorced from Casper Corporation and its penny banks" and therefore is not liable for the wrongful acts here. John Wright, supra, 419 F.Supp. at 315-16. Donsco has not challenged this conclusion. The district court also held, however, that Casper Pinsker is not personally liable for the actions he took as the agent of Casper Corporation. Id. at 312 (Finding of Fact No. 84), 313 (Conclusion of Law No. 3) and 315. Donsco does contest this holding.
 
 
 17
 A corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort. See, e. g., Solo Cup Co. v. Paper Machinery Corp., 359 F.2d 754 (7th Cir. 1966); 3A Fletcher's Cyclopedia of Corporations § 1158 (perm. ed. 1975). This principle applies where the conduct constitutes unfair competition. See Solo Cup Co. v. Paper Machinery Corp.,supra; Lahr v. Adell Chemical Co., 300 F.2d 256 (1st Cir. 1962); FTC v. Standard Education Society, 86 F.2d 692 (2d Cir. 1936), Modified on other grounds, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141 (1937); Hitchcock v. American Plate Glass Co., 259 F. 948 (3d Cir. 1919). See also Mead Johnson & Co. v. Baby's Formula Service, Inc., 402 F.2d 19 (5th Cir. 1968) (corporate officer may be individually liable for trademark infringement); Steak & Brew, Inc. v. Makins, 177 U.S.P.Q. 412 (D.Conn.1973) (also holding that officer may be individually liable for trademark infringement). The fact that an officer is acting for a corporation also may make the corporation vicariously or secondarily liable under the doctrine of respondeat superior; it does not however relieve the individual of his responsibility. Zubik v. Zubik, 384 F.2d 267, 275 (3d Cir. 1967), Cert. denied, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968); Solo Cup Co. v. Paper Machinery Corp.,supra; FTC v. Standard Education Society, supra.
 
 
 18
 The district court found that Casper Pinsker was the central figure in Casper Corporation and that Pinsker gave to the designer background material for use in designing the Casper Collector's Society Brochure and certificate of authenticity. This material included a copy of The Book of Knowledge Certificate of Authenticity. The court also found that Pinsker knew that Donsco was the only manufacturer of penny banks using such a certificate of authenticity in connection with its products. John Wright, supra, 419 F.Supp. at 307, 315. Pinsker testified that his duties as president of Casper Corporation included "arrangements of marketing services" and "the distribution of the banks." Appendix, p. 136. It is clear from the foregoing facts that Pinsker authorized and approved the acts of unfair competition which are the basis of Casper Corporation's liability. This is sufficient actual participation in the wrongful acts to make Pinsker individually liable. That these acts were done as agent of Casper Corporation does not affect Pinsker's liability.
 
 
 19
 We hold that Casper Pinsker is liable as a participant in a wrongful act. This liability is distinct from the liability resulting from the " piercing of the corporate veil" as that term is commonly used. The effect of piercing a corporate veil is to hold the owner liable. The rationale for piercing the corporate veil is that the corporation is something less than a bona fide independent entity. Pinsker is liable here as an actor rather than as an owner. His liability is in no way dependent on a finding that Casper Corporation is inadequately capitalized, that the corporation is a mere alter ego of Pinsker, that the corporate form is being used to perpetrate a fraud, or that corporate formalities have not been properly complied with. See generally, Zubik v. Zubik, supra; Minton v. Cavaney, 56 Cal.2d 576, 15 Cal.Rptr. 641, 364 P.2d 473 (1961); Zaist v. Olson, 154 Conn. 563, 227 A.2d 552 (1967); Walkovszky v. Carlton, 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966); Berkey v. Third Ave. Ry., 244 N.Y. 84, 155 N.E. 58 (1926). Thus the absence of such findings here does not affect Pinsker's liability. The only crucial predicate to Pinsker's liability is his participation in the wrongful acts. That participation has been clearly established on this record.
 
 IV. DAMAGES
 
 20
 A United States Magistrate was appointed as Special Master by the district court for the purpose of conducting a hearing on damages and submitting a report and findings. The Special Master found that Donsco's sales of penny banks were increasing from 1970 to 1973 but have decreased since that time. The decline in Donsco's sales is largely attributable to increased competition from lower-priced competitors and to Donsco's slow delivery of its banks. The Special Master stated:
 
 
 21
 We cannot attribute All of plaintiff's losses and defendant's profits Solely to defendant's use of the certificate of authenticity and false advertising. Plaintiff's proofs in this regard establish, at most, the inference that Some of its losses, particularly in the fiscal year ending April 30, 1974, where due to defendants' illegal activity when Casper was the only major competitor of plaintiff.
 
 
 22
 Report of Special Master, appendix, p. 209.
 
 
 23
 The Master also found that from April 30, 1973 to April 30, 1976 defendant Casper made no overall profit from the sale of penny banks. Id. The Master concluded:
 
 
 24
 Under the circumstances of this case, any award to plaintiff of its loss of profits based upon evidence adduced as to specific customers who were misled and deceived by the defendants would be inadequate to fairly compensate plaintiff for the illegal conduct of defendant.
 
 
 25
 Exercising our discretion to award a sum that is just where the actual damages are inadequate under the Lanham Act, we recommend an award of $62,500 as compensation for plaintiff's damages caused by the defendant's illegal actions.
 
 
 26
 Id.
 
 
 27
 The Report and Recommendation of the Master were approved by the district court. Dt.Ct. Order of October 5, 1977, appendix, p. 214.
 
 
 28
 The Master made no finding of actual damages except that "at most . . . some" of plaintiff's losses were due to defendant's illegal activities. The Master and the district court were apparently under the misapprehension that reasonable damages could be assessed without regard to actual damages. This court's opinion in Caesars World, Inc. v. Venus Lounge, Inc., 520 F.2d 269 (3d Cir. 1975) made it clear that such a method of assessment is impermissible. The court there construed Section 35 of the Lanham Act, 15 U.S.C. Section 1117 which is the apparent basis for the court's award below. That section provides:
 
 
 29
 § 1117. Same; recovery for violation of rights; profits, damages and costs; attorney fees
 
 
 30
 When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the Court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party. (Emphasis supplied)
 
 
 31
 The court construed damages as meaning "an award based on either actual damages to the plaintiff or actual profits of the infringer, measurable in dollars and cents." Caesars World, supra 520 F.2d at 274. If this were not the proper standard, the award would constitute a penalty rather than compensation contrary to the express language of the statute. Thus the statutory reference to the court's discretion where "the amount of the recovery based on profits" is inadequate or excessive only allows the court to consider plaintiff's losses resulting from the wrongful act as a measure of damages in lieu of profits reaped by the defendant from the wrongful act. Although in Caesars World there was no evidence of damages at all and here there was some evidence, this does not alter our conclusion. The amount awarded must be no more than three times the amount of actual damages. Therefore, the amount of actual damages must first be established before an award is made. Thus, the district court on remand must make a determination of actual damages and then may make an award of up to three times that amount.
 
 
 32
 Donsco has argued that the district court's finding that Casper made no overall profit from penny banks is in error. It points to evidence of Casper's profits from mail order sales. The record establishes that Casper did not sell solely by mail order and Casper's wrongful acts did not involve solely its mail order business. We conclude therefore that the court below did not err in considering all of Casper's mechanical bank sales in determining profits and we conclude further that the finding of no overall profit was not clearly erroneous.
 
 V. OTHER CLAIMS
 
 33
 Donsco also argues that it was entitled to counsel fees under § 43 of the Lanham Act on the theory that this is an "extraordinary" case because the district court found willful violations on Casper's part. The district court's refusal to award counsel fees was not an abuse of discretion on this record and will, therefore, be affirmed. Likewise, this record reveals no error by the district court in denying Donsco's motion to hold Casper in contempt as a result of certain advertisements for Casper's banks mailed by Gulf Oil Corporation.
 
 
 34
 The district court's judgment will be reversed insofar as it held Casper Pinsker not liable for the wrongful acts of Casper Corporation and there will be a remand for a redetermination of damages. In all other respects, the district court's judgment will be affirmed.