**CANDY H., etc., Plaintiff,**

**Tonya B., etc., Plaintiff-Intervenor,**

v.

**REDEMPTION RANCH, INC., et al., Defendants.**

**Civ. A. No. 82–100–N.**

United States District Court, M.D. Alabama, N.D.

May 2, 1983.

Morris S. Dees, Stephen J. Ellmann, Dennis N. Balske, John L. Carroll, and Ira A. Burnim, Montgomery, Ala., for plaintiff and plaintiff-intervenor.

David Gibbs and Richard Moore, Parma Heights, Ohio, and T.K. Moffett, Tupelo, Miss., for defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

Now before the court are three motions: a motion for preliminary injunction filed by the plaintiffs Candy H. and Tonya B.[1] and two motions to dismiss filed by the defendants Redemption Ranch, Inc., Bethesda Home for Girls, and Bob Wills.[2] For reasons set out below this court finds that all the motions are due to be denied.

## I. PROCEDURAL BACKGROUND

This case began on February 10, 1982, with the filing of a complaint on behalf of Candy H., alleging that Candy, a nineteen year old pregnant woman, had been fraudulently induced by the defendants to leave her home in Montgomery, Alabama, and to enter the Bethesda Home for Girls in Hattiesburg, Mississippi. The complaint premised on 42 U.S.C.A. 1985(3) sought primarily injunctive and declaratory relief, damages, and attorney fees.[3] Accompanying the complaint were two affidavits and a motion for temporary restraining order, requesting that the court order the defendants to produce Candy H., allow her to meet with her mother, and allow Candy's mother to take Candy home should Candy desire to leave. The affidavits presented evidence which suggested that the defendants had coerced Candy into remaining at the home even though she actually expressed her desire to return to Montgomery. The affidavit of Candy's twin sister suggested that Candy may have been in fear of punishment or reprisal from the home should she have strenuously vocalized her desire to leave or acted on her own to leave. This affidavit also suggested that Candy was not being allowed to communicate freely with her family regarding the practices of the home. In response, this court granted the plaintiffs' motion for temporary restraining order, ordered the defendants to allow Candy to meet with her mother, and directed the defendants not to interfere with Candy should she desire to return to Montgomery. Pursuant to that order Candy's mother travelled to Hattiesburg, met with Candy, and brought her back to Montgomery.

On February 17, 1982, Candy filed an amended complaint and a motion for preliminary injunction.[4] In her amended complaint Candy sought to be declared a representative of the putative class of "all other unwed pregnant girls who have been, are being, or will be kept at Bethesda Home for Girls." The court set Candy's motion for preliminary injunction for hearing on March 4, 1982, and ordered discovery to proceed on an expedited basis.[5] On Febru-

---

1. This court by order of March 9, 1982, ruled that all the girls involved in this action should be allowed to proceed under partial names. *See, e.g., Doe v. Stegall,* 653 F.2d 180 (5th Cir.1981).

2. This court will treat the defendants' May 17, 1982, motion to dismiss for failure to state a claim, and defendants' August 6, 1982, amended motion to dismiss for lack of personal jurisdiction as two separate motions.

3. The complaint also sought relief for alleged violations of 42 U.S.C.A. § 1986 (failure to prevent violations of civil rights); 42 U.S.C.A.

§ 1994 (peonage); the thirteenth amendment; and state law torts.

4. The original complaint was filed (1) by Candy, by and through her mother, (2) by Candy's mother, and (3) by Candy's twin sister. With the February 17 amendment, only Candy remained as a named plaintiff.

5. As a part of the expedited discovery, this court enjoined the defendants from removing any girls from the school for the purpose of impeding discovery. It appeared from affidavits filed with the court that in another case when court proceedings were initiated concern-

ary 18, 1982, the court ordered the plaintiffs to file a surety bond of $75,000.00 "to secure the payment of such costs and damages not to exceed such sum as may be suffered or sustained by any party found to be wrongfully enjoined by the orders of this court." On February 26, 1982, Tonya B. moved to intervene as a plaintiff in this suit, and requested a preliminary injunction and temporary restraining order on behalf of herself and four other girls being held at the Bethesda Home. On March 1, 1982, this court granted Tonya's motion to intervene but denied her motion for temporary restraining order on the grounds that she and the four other girls mentioned in her motion had already been released from the home. Tonya then filed her complaint in intervention seeking injunctive and declaratory relief, damages, and attorney fees, as well as certification of the class of "all females who are confined or might be confined at the Bethesda Home for Girls in Hattiesburg, Mississippi." This action then proceeded quickly to a hearing on Candy's and Tonya's motions for preliminary injunction.

Between March 4 and April 9, 1982, this court heard testimony on the plaintiffs' motions for preliminary injunction. During this time the plaintiffs amended their complaints to strike their prayers for damages. Also during this time the court—relying upon the pleadings, some of the evidence received on the motions for preliminary injunction, and other evidentiary materials submitted by the parties—issued orders denying the defendants Redemption Ranch, Inc., Bethesda Home for Girls, and Bob Wills's then recently filed motion to dismiss for lack of personal jurisdiction, motion to dismiss for improper venue, and motion for transfer.

On May 17, 1982, the defendants filed a motion to dismiss for failure to state a claim upon which relief may be granted. Later, on August 6, 1982, the defendants renewed their motion to dismiss for lack of personal jurisdiction.

## II. FINDINGS [6]

Candy H. is a resident of the Middle District of Alabama and Tonya B. is a resident of Arkansas. Redemption Ranch, Inc., which owns both Bethesda Home for Girls and a nearby boys home, is a Mississippi corporation with its principal place of business in Mississippi. The Bethesda Home is located in Mississippi, about twenty miles outside Hattiesburg. Bob Wills, the principal operator of the Bethesda Home and an officer and director of Redemption Ranch, resides at the home with his wife, Betty Wills.

Both Bethesda and the boys home are operated as ministries of the independent Baptist faith and have procured and housed young people from across the United States. These homes and Redemption frequently sent Bob Wills and young people from the two homes to visit various states in order to publicize the work of the homes, obtain financial support, and recruit young people for the homes. During these trips, Wills and the young people visited various churches where they sang and often "testified" about their religious experiences and about the help they were receiving from Wills at the homes. Also at these gatherings, Wills spoke about the work of Redemption and the homes, solicited contributions from the attending congregations, and distributed literature describing the homes. By these trips throughout the country, Wills was able to establish a network of churches whose pastors and members referred young people to the Mississippi homes. Over the two years prior to this lawsuit, Wills made at least ten such trips to Alabama and by these trips and the resulting referrals was able to obtain many young people from Alabama. In fact, prior to the filing of this lawsuit, Wills and the young people from the homes were sched-

---

ing another girl at the school, the girl unexplainedly disappeared. In the discovery order the court also ordered the defendants to produce several named girls, including Tonya B., who later intervened in this suit.

**6.** Many of the findings are from earlier orders of the court.

uled to make another such trip to Montgomery, Alabama in April 1982, to the Friendship Baptist Church, the church where Candy learned of Bethesda. Furthermore, as a part of its publicity campaign, Bethesda mailed thousands of brochures, called "the Bethesda Babbler," to its financial contributors and supporters, a substantial number of whom are Alabama residents. These brochures contained information about Bethesda's work, thanked past contributors, and indicated Bethesda's need for additional financial support.

To defray the cost of keeping the young people, both Bethesda and the boys home requested and normally received "contributions" from the parents and guardians of the young people admitted. Although parents and guardians were requested to contribute according to their financial ability, Bethesda suggested a contribution of $250.00 per month per girl as the amount needed to defray a girl's living expenses. Furthermore, in addition to the money received from the trips and from parents and guardians of young people at the homes, the homes received substantial contributions from other churches and individuals.

During the time that Wills has owned Redemption and operated Bethesda, the State of Alabama has been the source of more young girls than any other state except Georgia. Furthermore, of the $160,969.61 total amount received in 1981 in contributions, other than from parents or guardians of young people at the two homes, 12.9% or $20,716.92 came from Alabama contributors; and of the 166 total towns from which contributions were received, 12.6% or 21 were Alabama towns.

Candy first learned of Redemption and the Bethesda Home from Reverend John Knudsen, pastor of Friendship Baptist Church in Montgomery, Alabama, who, as a part of the referral network for Bethesda and the boys home, had learned of Redemption when his church was host to a choir group from the boys home approximately four years ago and from literature he had recently received from Bethesda. Candy, who was unmarried and four months preg-

nant, had been introduced to Knudsen by her sister. Knudsen, who had already taken at least one boy from Montgomery to Redemption's boys home, counselled Candy to go to Bethesda where she purportedly could have her child in privacy and arrange for its adoption by a Christian family. He explained to her that Bethesda had many restrictions, including the censoring of mail. Knudsen then telephoned Wills, who initially professed that Bethesda did not have room for Candy, on at least two occasions and arranged for Candy to talk to Wills. After Candy talked with Wills and agreed to abide by the rules of Bethesda, Wills agreed to take Candy and Candy agreed to go to Bethesda. Candy's mother, however, was concerned about the fact that the home censored all mail and about the fact that she knew little or nothing about the home. She and Candy therefore agreed that should Candy want to leave the home but was unable to make her desire known to her mother, she was to write her mother a letter in which the salutatory "dear" was misspelled "deer."

On or about January 23, 1982, Knudsen and another man took Candy, accompanied by her twin sister, from Montgomery, Alabama to Hattiesburg, Mississippi. When Candy arrived at Bethesda, Linda Williams, an employee of the home, took all of Candy's possessions, including her identification, and gave them to Candy's sister who was to take them back to Alabama. Williams also had Candy read and sign an agreement listing many, but not all, of the rules at Bethesda. Knudsen then gave Williams a check for one hundred dollars to be used for Candy's benefit; and then he, Candy's sister, and the other man left the home.

The rules of Bethesda, which were largely unwritten, required that girls were to remain at the home for one year; that they could not receive communications from outside persons, including their families, for three months; that they could not talk at all to other "new girls" at the home for three months; that they were not allowed to say anything "negative" about the home; that their telephone calls were monitored

and their incoming and outgoing mail censored, that is, unapproved parts of correspondence were "blacked out"; and that they could not talk to other girls about leaving the home. In addition, the girls were generally confined to the home, which was locked from both the inside and the outside. The rules, which the defendants contend were based on religious beliefs, were often and vigorously enforced by corporal punishment, which in some instances was excessive and caused substantial and long-term injuries.

Candy, from her counselling with Knudsen and her telephone conversation with Wills, was unaware of the extensive restrictions at Bethesda, in particular, the restrictions on her ability even to leave the home. She continuously complained to Wills and other staff members that she wanted to leave. She was finally allowed to telephone her sister, but forbidden to say anything about her discontent other than that she was homesick. Candy's sister, after consulting Knudsen about what Candy had said, decided that Candy would eventually get over her homesickness and therefore did nothing to help get Candy out of the home. Knudsen also telephoned Candy and counselled her to stay at the home. Although, at one time during Candy's stay at the home, Wills told her she could leave the home, he emphasized to her that the home was isolated in a rural setting, twenty miles from the nearest town, that she was without transportation from the home to the town, and that she did not have enough money for her bus fare home. Candy at that time needed only six additional dollars for a bus ticket from Hattiesburg back to Montgomery; but Wills and his staff refused either to give her the money from the $100.00 Knudsen had left for her or simply to lend her the money.

Finally, Candy's mother telephoned Bethesda but was not allowed to speak with her daughter. Then, on February 4, 1982, Candy wrote her mother a letter in which her mother was addressed as "deer," according to the pre-arranged code for help. Her mother then contacted an attorney and initiated these proceedings.

Tonya B. entered the Bethesda Home on January 30, 1982, pursuant to a juvenile court order from her home area in Arkansas. While at the home Tonya's mail was censored and she was not allowed to communicate freely with her mother. Tonya slept in a room with seven other girls, and was one of Candy's roommates. Tonya was afraid to voice her dissatisfaction with the home and its practices out of fear of punishment. After learning of the lawsuit, however, Tonya slipped a note to Candy's lawyers asking them to help her get out. During Tonya's initial deposition on February 26, 1982, after she had testified adversely to the home's interest, and made it clear that she wished to leave, the defendants' attorneys told her that she would not be required to return to the home.

Since the initiation of these proceedings approximately thirty or more girls have voluntarily left the home. The court understood that at the time of the preliminary injunction hearing less than twenty girls remained at the home. In addition, the court has heard testimony that the home has substantially changed a number of its practices, at least for the time being. Those girls who have expressed an interest to leave the home have been allowed to leave freely. In addition, the defendants profess that the girls who now remain at the home have done so on the basis of voluntary and informed consent.

### III. MOTIONS TO DISMISS

The defendants have moved for dismissal of the plaintiffs' claim on two grounds. In the first motion, the defendants assert that the plaintiffs have not stated a claim upon which relief may be granted. In the second motion, the defendants have renewed their contention that the court lacks personal jurisdiction over them. This court will first discuss the motion to dismiss for lack of personal jurisdiction.

#### A. Motion to Dismiss for Lack of Personal Jurisdiction

Once a nonresident defendant challenges personal jurisdiction, as has been done in

this case, the burden is on the plaintiff to establish that such jurisdiction exists. This burden is a twin burden requiring that the plaintiff satisfy two requirements: first, that the assertion of personal jurisdiction over the defendant is authorized by the forum state's long-arm statute or rule; and, second, that the assertion of such jurisdiction over the defendant comports with the requirements of federal due process. *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 489–91 (5th Cir.1974). However, since Alabama's long-arm rule, Rule 4.2(a)(2) of the Alabama Rules of Civil Procedure, authorizes the assertion of personal jurisdiction to the limits of federal due process, *Semo Aviation, Inc. v. Southeastern Airways Corp.*, 360 So.2d 936, 939 (Ala.1978); *Garrett v. Key Ford, Inc.*, 403 So.2d 923, 924 (Ala.Civ.App.1981), the plaintiff's twin burden in this case collapses into the one issue of whether the assertion of personal jurisdiction over the defendant meets the requirements of federal due process.

In this circuit, the test for determining whether the assertion of personal jurisdiction over a nonresident defendant comports with due process, as explained in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and its progeny,[7] is considered as being two-pronged: whether the defendant has had sufficient minimum contacts with the forum state so that it is fair and reasonable to require the defendant to come into the state and defend the suit; and whether the defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws. *Product Promotions, Inc. v. Cousteau, supra*, 495 F.2d at 494. Furthermore, courts have uniformly recognized that the commission in the forum of "a single tort not only in situations involving the employment in the forum of dangerous instrumentalities, but also in the context of commonplace torts" generally satisfies both prongs of this test. *Rebozo v.*

*Washington Post Company*, 515 F.2d 1208, 1214 (5th Cir.1975) (footnotes omitted). *See also Rosenblatt v. American Cyanamid Company*, 86 S.Ct. 1, 3, 15 L.Ed.2d 39 (Goldberg, Circuit Justice 1965). *But see Austin v. North American Forest Products*, 656 F.2d 1076, 1089–91 (5th Cir.1981) (contract case); *Marathon Metallic Building Company v. Mountain Empire Construction Company*, 653 F.2d 921, 923 (5th Cir.1981) (contract case); *Bigelow-Sanford, Inc. v. Gunny Corporation*, 649 F.2d 1060, 1063–64 (5th Cir.1981) (contract case). For example, in *Simon v. United States*, 644 F.2d 490 (5th Cir.1981), a Louisiana plaintiff sued a Georgia defendant in a Louisiana court, contending that the Georgia defendant caused his unlawful arrest, search and detention in Georgia by conspiring with others to lure him from Louisiana to Georgia. The appellate court held that although the Georgia defendant never came to Louisiana, his alleged tortious actions had a direct and substantial result in Louisiana—that is, they were specifically directed to a defendant in Louisiana. Similarly in *Edwards v. Associated Press*, 512 F.2d 258 (5th Cir.1975), the appellate court concluded that a Mississippi court could exercise personal jurisdiction over a nonresident publisher who purposely directed an allegedly libelous story toward Mississippi readers. The appellate court stated that the non-resident defendant's actions were "purposefully and specifically aimed at Mississippi, as surely as if the proverbial gunman had stood in Alabama and fired into a crowd in Mississippi," 512 F.2d at 267 (footnotes omitted). Furthermore, there is the new Fifth Circuit case of *Mississippi Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003 (5th Cir.1982), which though not binding on this court is persuasive. In that case a Mississippi corporation sued in tort two California corporations and a California individual in a Mississippi court, contending that the California defendants conspired to cheat and defraud the Mississippi corporation of

---

7. *See, e.g., World-Wide Volkswagen Corporation v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Kulko v. Superior Court of California*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

amounts due on some unpaid invoices. After concluding that the complaint of the Mississippi corporation stated a cause of action, the appellate court stated:

> The damage caused by the tort-caused breach of this ... Mississippi-centered contract resulted in the nonpayment in Mississippi of amounts due there. Under these circumstances, the due process requirements of sufficient contact with Mississippi and foreseeable involvement with its law are met by the intentional acts of the non-resident defendants that caused a breach of a Mississippi-centered contract and resultant damage in Mississippi.

681 F.2d at 1012. In all of the above cases the appellate courts generally reasoned that where a nonresident defendant had engaged in a *deliberate, nonfortuitous tortious* act in the forum state or caused such an act in the state, he could reasonably foresee that suit in the forum state would ensue; and, as a result, in such circumstances the required affiliating circumstances were present to such a degree as not to offend traditional notions of fair play and substantial justice by hailing the defendant into a court in the forum state.

However, when dealing with corporate officers and employees, such as Wills, in their *individual* capacity, a court must consider another factor: personal jurisdiction over corporate officers and employees in their individual capacity may not be predicated merely upon personal jurisdiction over the corporation itself; rather, a court must look to the individual and personal contacts, if any, of the officers and employees with the forum state. *Dudley v. Smith*, 504 F.2d 979, 982 (5th Cir.1974); *Costin v. Olen*, 449 F.2d 129, 131 (5th Cir. 1971).

Courts in determining whether corporate officers and employees are subject to personal jurisdiction have drawn a distinction between circumstances where the officers and employees are charged with liability based on tortious conduct and circumstances where they are charged with liability based on nontortious conduct. *Compare Dudley v. Smith, supra, with Costin v. Olen, supra; see also Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3rd Cir. 1978); *Hoffman v. Chandler*, 431 So.2d 499, 17 A.B.R. 1158, 1161–62 (Ala.1983). *But see, Marine Midland Bank v. Miller*, 664 F.2d 899, 920 (3d Cir.1981); *Weller v. Cromwell Oil Co.*, 504 F.2d 927 (6th Cir. 1974); *Thames v. Gunter-Dunn, Inc.*, 373 So.2d 640 (Ala.1974).[8] In Alabama, as in most states, the general rule is that officers or employees of a corporation are liable for torts in which they have personally participated, irrespective of whether they were acting within their corporate authority. *Chandler v. Hunter*, 340 So.2d 818, 822 (Ala.Civ.App.1976); *see also Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 907 (1st Cir.1980); *Donsco, Inc. v. Casper Corp., supra*, 587 F.2d at 606; *Donner v. Tams-Witmark Music Library, Inc.*, 480 F.Supp. 1229, 1233 (E.D.Pa.1979). Therefore, if there is evidence that officers and employees of a corporation have personally e gaged in a tort in the forum state either by personally taking part in the tort in the forum state or by knowingly directing other officers and employees or any agent of the corporation to commit a tort in the forum state, then personal jurisdiction over the officers or employees is present because, as this court has already stated, the commission in the forum state of "commonplace torts" generally satisfies the above described two-pronged test which must be satisfied for personal jurisdiction to be present. *Rebozo v. Washington Post Co., supra*, 515 F.2d at 1214; *see Costin v. Olen, supra; Simon v. United States, supra; Edwards v. Associated Press, supra; see also Donsco, Inc. v. Casper Corp., supra; Donner v. Tams-Witmark Music Library, Inc., supra; Hoffman .v. Chandler, supra*. Therefore, although evidence that officers and employees of a corporation with the requisite mini-

---

**8.** Although this court has cited several Alabama cases, it should be noted that "[t]he issue of jurisdiction under Alabama's long arm statute is not controlled by state law but rather is a question of federal due process." *Dudley v. Smith, supra*, 504 F.2d at 982.

mum contacts with the forum state were mere alter egos of the corporation might sustain the assertion of personal jurisdiction over the officers and employees in the forum state, see *Dudley v. Smith, supra,* the absence of such evidence does not necessarily compel the conclusion that personal jurisdiction over the officers and employees is lacking when a claim is based on alleged tortious conduct in the forum state. Similarly, although evidence as to whether officers and employees of a corporation with the requisite contacts with the forum state acted within their corporate authority might in some circumstances be relevant, see *Thames v. Gunter-Dunn, Inc., supra,* such evidence is not necessarily determinative as to whether personal jurisdiction over the officers and employees is present when a claim is based on alleged tortious conduct in the forum state.

■ The court is of the opinion that based upon the above evidence and principles of law such minimum contacts have been shown as to Redemption Ranch, Inc., the home, and Wills. Within recent years, Wills and young people from the Bethesda Home as well as the boys home have made trips into Alabama to publicize the homes, solicit money, and recruit more young people. Pursuant to a referral network set up in Alabama by these trips, young girls from Alabama have been referred to the Bethesda Home. The Bethesda Home and Redemption Ranch have solicited and received substantial contributions from Alabama residents in the form of contributions made during the trips, contributions made by the parents and guardians of Alabama girls at the Bethesda Home, and contributions from other Alabama sources. The Bethesda Home and Redemption have sent numerous mailings into Alabama requesting financial support. These contacts alone are sufficient to sustain personal jurisdiction over Wills, Redemption and the Bethesda Home. See *Prejean v. Sonatrach, Inc.,* 652 F.2d 1260, 1265 (5th Cir.1981); *Garrett v. Key Ford, Inc., supra.* But more significantly, there is substantial evidence that the defendants, through John Knudsen, fraudulently lured Candy from Montgomery, Alabama to the Bethesda Home; thus, there is evidence that the defendants have engaged in deliberate tortious activity within Alabama. Knudsen's recommendation to Candy that she go to the Bethesda Home was based on knowledge he had received from Wills during his choir trips to Montgomery. See *Simon v. United States,* 644 F.2d 490, 499 (5th Cir.1981) (if "a tortfeasor used a commercial messenger (ignorant of the contents of the message delivered) to lure a Louisiana resident into Mississippi for the purpose of committing a tort upon him in Mississippi, the act of the messenger in delivering the message is no less the act of the tortfeasor than if the tortfeasor had himself personally delivered the message"). Furthermore, final arrangements for Candy to go to Bethesda were by telephone conversations between Knudsen and Wills as well as directly between Wills and Candy.[9]

### B. Motion to Dismiss for Failure to State a Claim

42 U.S.C.A. § 1985(3) provides a cause of action against any one of "two or more

---

**9.** The defendants advance the interesting argument that first amendment considerations in this case require "a greater showing of contact" in order to satisfy the due process clause. In this circuit, as the defendants correctly note, when a nonresident publisher is sued for libel, the issue of personal jurisdiction is subject to first amendment considerations which "require a *greater showing of contact* to satisfy the due process clause than is necessary in asserting jurisdiction over other types of tortious activity," *Cox Enterprises, Inc. v. Holt,* 678 F.2d 936, 937 (11th Cir.1982), *quoting New York Times Co. v. Connor,* 365 F.2d 567, 572 (5th Cir.1966) (emphasis added). The theory behind these first amendment considerations is that "an ex-

pansion of jurisdiction to the limits permitted by due process in other types of cases" would "tend to have a 'chilling' effect on the press because publishers would hesitate to distribute their newspapers in any areas other than those of their major circulation." *Cox Enterprises, Inc. v. Holt, supra,* 678 F.2d at 937–38.

Whether the "greater showing of contact" test will be expanded by this circuit to include religious activity is an issue this court need not address at this time. If one assumes that the test does apply to religious activity, the evidence of the defendants' contact with the forum state in the instant case amply meets the test.

persons in any State or Territory [who] conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws...." Section 1985(3) will support a claim for injunction, declaratory relief, or damages. *Scott v. Moore,* 680 F.2d 979 (5th Cir.1981) (en banc), *cert. granted sub nom. United Brotherhood of Carpenters Local 610 v. Scott,* —— U.S. ——, 103 S.Ct. 442, 74 L.Ed.2d 599 (1982); *Mizell v. North Broward Hospital District,* 427 F.2d 468, 473 (5th Cir.1970). In *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court "accord[ed] the words of the statute their apparent meaning" and held that section 1985(3) provided a civil remedy against the wholly private infringement of constitutional rights. 403 U.S. at 97, 91 S.Ct. at 1795. In that case the Court held that private conspiratorial infringements were actionable when the alleged conspiracy involved "invidiously discriminatory motivation:"

> The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.

403 U.S. at 102, 91 S.Ct. at 1798 (footnotes omitted) (emphasis in original). Since *Griffin,* federal courts have applied section 1985(3) in a variety of contexts. *See, e.g., Scott v. Moore, supra,* (union violence); *Ward v. Connor,* 657 F.2d 45 (5th Cir.1981), *cert. denied* 455 U.S. 907, 102 S.Ct. 1253, 71

L.Ed.2d 445 (1982) (deprogramming of religious group member); *Life Insurance Co. v. Reichardt,* 591 F.2d 499 (9th Cir.1979) (employment discrimination against women); [10] *Means v. Wilson,* 522 F.2d 833 (8th Cir. 1975), *cert. denied,* 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976) (Indian tribal elections); *Glasson v. City of Louisville,* 518 F.2d 899 (6th Cir.), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975) (political protest); *Smith v. Cherry,* 489 F.2d 1098 (7th Cir.1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974) (state political primary); *Cameron v. Brock,* 473 F.2d 608 (6th Cir.1973) (supporters of a political candidate); *Action v. Gannon,* 450 F.2d 1227 (8th Cir.1971) (disruption of religious services); *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan,* 518 F.Supp. 993 (S.D.Tex.1981) (Klan disruption of alien fishing activity); *Rios v. Marshall,* 530 F.Supp. 351, 361 (S.D.N.Y. 1981) (domestic migrant workers). The former Fifth Circuit's recent application of section 1985(3) in the context of a violent labor dispute articulated the standards by which this court must evaluate the claims of the instant case. *Scott v. Moore, supra,* 680 F.2d at 987–96.[11] Based on *Griffin* and the subsequent Fifth Circuit case of *McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919 (5th Cir.1977) (en banc), the court in *Scott* set out the following five elements necessary to establish a section 1985(3) cause of action:

> (1) the defendant must conspire or go in disguise on the highway or premises of another;
>
> (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; and

---

**10.** *Reichardt,* however, was implicitly overruled by the Supreme Court in *Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), which held that employment discrimination as defined under Title VII of the Civil Rights Act of 1964 may not be addressed in the remedial framework of § 1985(3) because of the nature of Title VII's own remedial provisions.

**11.** Contrary to the October 12, 1982, assertion of the defendants, this court is bound by *Scott v. Moore* and the other former Fifth Circuit cases cited unless and until the decisions are modified by the Eleventh Circuit en banc or reversed by the U.S. Supreme Court. *Bonner v. City of Prichard, Alabama,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc); *Banco Nacional v. Cooper,* 680 F.2d 727, 730 n. 3 (11th Cir. 1982).

(3) one or more of the conspirators must commit some act in furtherance of the conspiracy; whereby

(4) another is either (a) injured in his person or property or (b) deprived of having and exercising any right or privilege of a citizen of the United States [; and]

\*   \*   \*   \*   \*   \*

(5) that the conspirators' conduct must be unlawful independent of the section 1985(3) violation.

680 F.2d at 987.

█ In this case it is clear that the plaintiffs have made sufficient allegations to withstand judgment as to the first, third, fourth, and fifth elements of the section 1985(3) cause of action. The complaint alleges an ongoing agreement among the defendants and their agents to bring girls to the Bethesda Home, to impose the home's rules on the girls, and to enforce those rules by strict supervision of the girls and by corporal punishment. In addition, the plaintiffs have alleged the common law torts of fraud, misrepresentation, and false imprisonment as to themselves as well as assault and battery as to the class. *See, e.g., Kaye v. Pawnee Construction Co.,* 680 F.2d 1360, 1366 (11th Cir.1982); *Ernest v. Pritchett-Moore, Inc.,* 401 So.2d 752 (Ala. 1975); *McMahon v. McMahon,* 247 Miss. 822, 157 So.2d 494 (Miss.1963); *Martin v. Santora,* 199 So.2d 63 (Miss.1967); *Snowden v. Osborne,* 269 So.2d 858 (Miss.1972); W. Prosser, *Law of Torts,* 37, 41, 42, 683 (4th ed. 1971). For the purpose of the defendants' motion, therefore, the plaintiffs have satisfied the conspiracy requirement, the act in furtherance of the conspiracy, the alleged injury, and the requirement of independent unlawfulness.

█ The second element of the section 1985(3) cause of action, however, requires this court to evaluate the allegations of the plaintiffs to determine whether the alleged conspiracy can be said to have been "for the purpose of depriving, either directly or indirectly, [the plaintiffs] of the equal protection of the laws." *Scott v. Moore, supra,* 680 F.2d at 987. As the court in *Scott v.*

*Moore* noted, this requirement in turn has two components: (1) the violation of some protected right, and (2) class-based discriminatory animus. *Id.* In this case the named plaintiffs primarily complain of restrictions on the fundamental liberty interests of (i) the right of reproductive autonomy, *see, e.g., Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); (ii) the right of familial association, *see, e.g., Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); and (iii) the right to travel, *e.g., Griffin v. Breckenridge, supra.* Because it is firmly established that the right to travel is an assertable right under section 1985(3), *Griffin v. Breckenridge, supra,* the court need not reach the plaintiffs' other asserted rights at this point.

The final issue, therefore, is the requirement that the plaintiffs sufficiently allege the existence of class-based discriminatory animus. In *Scott v. Moore* the former Fifth Circuit identified two types of classes which may claim protection within the context of section 1985(3). These are (i) classes "having common characteristics of an inherent nature," in other words, "those kinds of classes offered special protection under the equal protection clause," *id.,* 680 F.2d at 991; and (ii) nonprotected classes which are nevertheless found to be "the kinds of classes Congress was trying to protect when it enacted the Ku Klux Klan Act," of which section 1985(3) is a part, *id.*

█ In this case the court finds that the allegations of the plaintiffs bring the plaintiffs within the ambit of section 1985(3)'s requirement of class-based animus. To begin with, the court must discuss the class or classes involved in this suit. Without ruling out several possible alternative definitions, the court finds it sufficient that with regard to both Candy and Tonya the plaintiffs in this case have alleged discriminatory animus on the basis of their juvenile, minor, or unemancipated female status, and in particular on their characterization as delinquent or wayward girls; and it is sufficient that with regard to Candy they have claimed a class of young, unmarried pregnant females. The allegations of the plain-

tiffs reflect that these classes were the basis for the challenged actions of the defendants toward the plaintiffs.

This court is of the opinion that these classes may fall within the ambit of section 1985(3)'s protection under the equal protection clause. While the Supreme Court has not accorded "suspect class" treatment to juveniles, wayward girls, or young unmarried pregnant women, the Court has recognized that some of these groups are in fact entitled to "intermediate scrutiny" under the equal protection clause. *See Plyler v. Doe,* 457 U.S. 202, 217–18 & n. 16, 102 S.Ct. 2382, 2395 & n. 16, 72 L.Ed.2d 786 (1982) (discussing the court's role based on "intermediate" scrutiny). The Supreme Court has recognized that unemancipated children are deserving of special consideration because they "can affect neither their parents' conduct nor their own status." *Plyler v. Doe, supra,* 102 S.Ct. at 2396 (children of illegal aliens denied public education).[12]

■ The defendants, however, urge an additional reason for dismissal of the plaintiffs' claims. They contend that their actions at the Bethesda Home were and are fully protected by their first amendment right of free exercise of religion. While this court recognizes the defendants' right to first amendment religious freedom, the court must point out that there is a fundamental distinction between "freedom to believe and freedom to act." *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The freedom to believe is absolute while the freedom to act "remains subject to regulation for the protection of society." *Id.* The duty of the court is to weigh the competing interests at issue in any dispute in order to evaluate a

particular claim of free exercise of religion. *United States v. Middleton,* 690 F.2d 820 (11th Cir.1982). The court, however, must give substantial deference to religious practice. As the Supreme Court stated in *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972): "The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." In the context of the allegations made in this case, the court recognizes the plaintiffs' right to travel to be "of the highest order," and not otherwise protectable than through the vehicle of court action.[13]

## IV. MOTION FOR PRELIMINARY INJUNCTION

■ Article Three, section two, of the United States Constitution provides that the judicial power of the United States shall extend to certain "Cases" and "Controversies." As a result, federal courts will not decide suits in which parties lack standing, which call for the issuance of advisory opinions, or which present moot questions. A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980), *quoting Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969). Because of the "case or controversy" requirement of Article III, mootness in federal litigation deprives the court of jurisdiction over the case. *Id.; North Carolina v. Rice,* 404 U.S.

---

12. *See also Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (vital interests of parent and child in parental rights termination proceedings); *Parham v. J.R.,* 422 U.S. 584, 601–07, 99 S.Ct. 2493, 2504–06, 61 L.Ed.2d 101 (1979) (juvenile commitment proceedings); *Planned Parenthood v. Danforth,* 428 U.S. 52, 72–75, 96 S.Ct. 2831, 2842–44, 49 L.Ed.2d 788 (1976) (minor's rights in abortion procedures); *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (juvenile proceedings).

13. The court notes that the defendants' motion to dismiss for failure to state a claim states that said motion "is based upon the records, pleadings and files in this action...." Material other than the pleadings may not be considered on such a motion. Fed.R.Civ.P. 12(b)(6). However, were the court to consider the evidence on a motion for summary judgment, it is clear that the evidence raises issues which would preclude judgment in favor of the defendants. Fed.R.Civ.P. 12(c); 56(c).

244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971); *Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 394 n. 3, 11 L.Ed.2d 347 (1964).[14] Mootness may result from a number of causes, including expiration of the plaintiff's claim, satisfaction of the claim by the defendant, cessation of the unlawful conduct without likelihood of repetition, or by interim remedy of the court itself which renders the dispute unlikely to recur in the future. *United States Parole Comm'n v. Geraghty, supra; Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980); *County of Los Angeles v. Davis,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979).[15]

▮▮▮▮ An exception to the rule that moot cases be dismissed applies to: (1) cases which are "capable of repetition, yet evading review," *e.g. Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and (2) class actions in which a live dispute remains as to at least certain class members even though the named plaintiff's individual claim has become moot, *e.g., Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Disputes which are capable of repetition yet evading review require a finding that (i) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (ii) there is a reasonable expectation that the same complaining party will again be subject to the same action. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975); *Sosna v. Iowa, supra.* As for class actions in which the named plaintiff's claim becomes moot before full adjudication of the substantive issues, the court will allow the suit to go forward as a class action when (i) the class has been certified prior to the mooting of the plaintiff's claims, or (ii) the class certification "relates

back" to the filing of the complaint or request for certification. *See, e.g., United States Parole Comm'n v. Geraghty,* 445 U.S. at 404–05, 100 S.Ct. at 1213–14; *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Swisher v. Brady,* 438 U.S. 204, 98 S.Ct. 2699, 57 L.Ed.2d 705 (1977); *Sosna v. Iowa, supra* 419 U.S. at 403 n. 11, 95 S.Ct. at 559 n. 11. Class certification may relate back when (i) the named plaintiff's claim has expired as a result of the transitory nature of the claim; (ii) the defendant has purposefully mooted the claim; or (iii) some other action has occurred between the filing of the suit and certification which unreasonably impairs the plaintiff's right to seek judicial review. *See, e.g., Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1045–51 (5th Cir.1981). Whenever class certification relates back, the named plaintiff has standing to pursue the issue of certification regardless of the mootness of his or her individual claim. The court's duty at the time of passing on the certification question after the mooting of the named plaintiff's claim, however, is to determine: (i) whether there remains a live case or controversy between the defendant and at least some members of the class the plaintiff seeks to represent, and (ii) whether the named plaintiff remains a proper class representative. *Armour v. City of Anniston,* 654 F.2d 382 (5th Cir. Unit B 1981); *Zeidman v. J. Ray McDermott & Co., supra; Satterwhite v. City of Greenville,* 634 F.2d 231 (5th Cir. 1981) (en banc).

▮▮▮▮ In this case the evidence reflects that neither Candy nor Tonya will ever again be subjected to the Bethesda Home's challenged practices. After this court granted the motion for temporary restraining order filed with the complaint on Feb-

---

**14.** The existence of a case or controversy is a necessary prerequisite to jurisdiction regardless of whether the action is for injunctive relief, damages, or declaratory judgment; a plaintiff must present a "live" claim as to each type of relief he seeks as a matter of right. *City of Los Angeles v. Lyons,* —— U.S. ——, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

**15.** *See also Kremens v. Bartley,* 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977); *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975); *Board of School Comm'rs v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975); *Sosna v. Iowa, supra; SEC v. Medical Committee for Human Rights,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972).

ruary 10, 1982, Candy was released from the home. She returned to her mother in Montgomery, and has no stated desire to return to the Bethesda Home. A similar set of circumstances accompanied Tonya's release from the home. While the plaintiff's attorneys were conducting depositions at the home immediately after the suit had been filed, Tonya told the attorneys that she was being held in fear of harm and desired to leave. Tonya then sought to intervene in this suit and moved for a temporary restraining order for her own release. The defendants, however, allowed Tonya to leave the home before this court had an opportunity to act on the motion for temporary restraining order. As with Candy, there is no evidence that Tonya wishes to return to the home or that the home seeks or would allow her return. Candy and Tonya contend, nevertheless, that they are entitled to injunctive relief, including preliminary injunctive relief, on behalf of the class of girls they seek to represent.

This case presents a situation in which it is realistically impossible for a plaintiff to keep an injunctive claim alive long enough to seek any lasting relief on behalf of others. In all instances, either immediate injunctive relief requiring the defendants to release a girl being kept against her wishes, as in Candy's case, or the defendant's "voluntary" relinquishment of a girl in the face of court action, as in Tonya's case, would render any future injunctive relief as to the particular girl involved unnecessary. Given this situation, this case may well fit within the narrow class of cases in which the named plaintiffs will be allowed to pursue class representation even though their individual claims for injunctive relief may be moot. *See, e.g., Sosna v. Iowa, supra.* The plaintiffs therefore should be allowed to pursue class representation.

However, whether the plaintiffs will ultimately succeed in certifying a class is an issue that need not be addressed by the court at this time, that is, on the plaintiffs' motion for preliminary injunction. For, assuming that the plaintiffs' class can be properly certified, the court is of the opinion that the plaintiffs' motion for preliminary injunction is still due to be denied. A preliminary injunction is "an extraordinary and drastic remedy," *United States v. Lambert,* 695 F.2d 536, 539 (11th Cir.1983), *quoting Texas v. Seatrain International, S.A.,* 518 F.2d 175, 179 (5th Cir.1975); therefore, "its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion," *United States v. Lambert, supra.* In order for injunction to issue, a district court must be satisfied that the moving party has clearly met all of the following four prerequisites:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Id., quoting Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).

The evidence in the instant case reflects that in the wake of this lawsuit the defendants have changed a number of their practices—e.g., there have been recent instances in which girls expressing a desire to leave Bethesda Home have been allowed to leave freely; and, according to the defendants, girls who have elected to stay at the school have done so on the basis of voluntary and informed consent. Although there is some question as to whether these changes in the defendants' practices are reasonably permanent—particularly in view of the defendants' claim that their pre-lawsuit practices were based on religious beliefs—the court is nevertheless of the opinion that the extraordinary remedy of preliminary injunctive relief is inappropriate *at this time* in these proceedings—that is, there is no evidence that the plaintiffs or the putative classes they represent will suffer irreparable injury if injunctive relief is not granted pending final disposition of this case.

An appropriate order will be entered in accordance with this opinion.