# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| AMERIMARK INTERACTIVE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERIMARK HOLDINGS, LLC, | ) C.A. No. N21C-12-175 MMJ CCLD | |
| PRUDENTIAL CAPTIAL PARTNERS | ) | |
| II, L.P., MARCUS BRADSHAW, MARK | ) | |
| ETHIER and STEVEN SZEJNER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Submitted: August 11, 2022
Decided: November 3, 2022

On Amerimark Holdings, LLC, Marcus Bradshaw,
and Mark Ethier's Motion to Dismiss
**GRANTED IN PART, DENIED IN PART**

On Prudential Capital Partners II, L.P. and Stephen Szezner's Motion to Dismiss
**GRANTED IN PART, DENIED IN PART**

## <u>OPINION</u>

Andrew L. Cole, Esq., Jack M. Dougherty, Esq., Cole Schotz, P.C., Wilmington, DE, Steven L. Klepper, Esq. (*pro hac vice*) (argued), Brendan P. Barry (*pro hac vice*), Cole Schotz, P.C., Hackensack, NJ, *Attorneys for Plaintiff*

Patricia R. Urban, Esq., Megan I. Brison, Esq., Pinckney, Weidinger, Urgan & Joyce LLC, Wilmington, DE, Eric B. Fisher, Esq. (*pro hac vice*) (argued), Sarah Dowd, Esq., (*pro hac vice*), Binder & Schwartz LLP, New York, NY, Anna E. Currier, Esq., James G. Gorman III, Esq., Blank Rome LLP, Wilmington, DE,

Jason A. Snyderman, Esq. (*pro hac vice*) (argued), Charles A. Fitzpatrick, Esq. (*pro hac vice*), Blank Rome LLP, Philadelphia, PA, Shawna J. Henry, Esq. (*pro hac vice*), Blank Rome, Pittsburgh, PA, *Attorneys for Defendants*

**JOHNSTON, J.**

## FACTUAL AND PROCEDURAL CONTEXT

This case arises from a dispute after the sale of three companies to a retailer of fashion, health and beauty, houseware, home decor, apparel, and personal care products. Plaintiff AmeriMark Interactive LLC ("Buyer") and Defendant AmeriMark Holdings, LLC ("Seller") negotiated a $322.5 million transaction. Buyer purchased from Seller all the equity in three direct mail marketing companies: LTD Commodities LLC ("LTD"), AmeriMark Intermediate Holdings, LLC ("AIH"), and AmeriMark Intermediate Sub, Inc. ("AIS") (collectively, the "Acquired Companies"). Buyer and Seller memorialized this transaction in the Equity Purchase Agreement ("EPA"), dated October 15, 2021. Prudential Capital ("Prudential") was Seller's former majority shareholder and participated in the transaction's negotiations.

Marcus Bradshaw ("Bradshaw") is Seller's former Chief Financial Officer. Mark Ethier ("Ethier") is Seller's former Chief Executive Officer. Stephen Szejner ("Szejner") is allegedly Prudential's Managing Director.

Buyer brought an action seeking damages arising from Defendants' alleged fraudulent conduct and breaches of representations and warranties in the EPA. The

Acquired Companies had a key vendor named LSC Communications US, LLC ("LSC"). LSC prints catalogs in preparation for the fourth quarter holiday retail season. The fourth quarter was particularly important to Buyer because the fourth quarter sales made up a large portion of the Acquired Companies' annual sales. Buyer sought to close the transaction—and did close the transaction—before the end of the fourth quarter of 2021 to capture the sales from the fourth quarter holiday season. LSC allegedly gave written notice ("LSC Letter") to the Acquired Companies to enforce a "force majeure" event from a labor shortage. The "force majeure" event allegedly would result in diminished circulation of the printed catalogs for the fourth quarter holiday season.

Defendants allegedly concealed LSC's force majeure event and the LSC Letter from Buyer until after the closing to induce Buyer to close on the transaction. The sales from the fourth quarter of 2021 were much lower than Buyer had anticipated. Buyer alleges that if it had known of LSC's labor shortage and notice of force majeure, it would have not closed on the transaction—or at least would not have paid the full $322.5 million for the Acquired Companies.

Buyer filed its original complaint on December 22, 2021. Defendants Prudential and Szejner filed a motion to dismiss on February 24, 2022. Defendants Seller, Bradshaw, and Ethier also filed a motion to dismiss on February 24, 2022. Instead of responding to the motions to dismiss, Buyer filed its First Amended

Complaint on April 7, 2022. Prudential and Szejner then filed their Motion to Dismiss Buyer's First Amended Complaint on May 10, 2022. Seller, Bradshaw, and Ethiers also filed their Motion to Dismiss Buyer's First Amended Complaint on the same day. The Court heard oral argument regarding the motions to dismiss on August 11, 2022.

## RULE 12(b)(6) STANDARD

In a Rule 12(b)(6) Motion to Dismiss, the Court must determine whether the claimant "may recover under any reasonably conceivable set of circumstances susceptible of proof."[1] The Court must accept as true all well-pled allegations.[2] Every reasonable factual inference will be drawn in the non-moving party's favor.[3] If the claimant may recover under that standard of review, the Court must deny the Motion to Dismiss.[4]

## ANALYSIS

Buyer alleges four causes of action. The first cause of action (Count I) alleges all Defendants fraudulently induced Buyer through contractual fraud in the representations and warranties in the EPA, Section 4.23, Section 4.5(b)(ii), and Section 3.7. The second cause of action (Count II)—which Buyer pleads in the

---

[1] *Spence v. Funk*, 396 A.2d 967, 968 (Del.1978).
[2] *Id.*
[3] *Wilmington Sav. Fund. Soc'y, F.S.B. v. Anderson*, 2009 WL 597268, at *2 (Del. Super.) (citing *Doe v. Cahill*, 884 A.2d 451, 458 (Del.2005)).
[4] *Spence*, 396 A.2d at 968.

alternative to the first cause of action with respect to Prudential, Szejner, and Ethier—alleges Prudential, Szejner, Ethier, and Bradshaw aided and abetted the fraudulent conduct of Seller. The third cause of action (Count III) alleges all Defendants conspired to fraudulently induce Buyer to purchase the Acquired Companies. The fourth cause of action (Count IV)—which Buyer pleads in the alternative to the first cause of action—requests indemnification for breach of representations and warranties through contractual fraud in the EPA, Section 4.23, Section 4.5(b)(ii), and Section 3.7.

For Counts II and III to proceed, Buyer must have pled an underlying tort. If Count I is dismissed, then the Court also must dismiss Counts II and III.

### *Equity Purchase Agreement*

The Non-Recourse provision in Section 8.11 of the EPA is very broad. It states:

> Except to the extent expressly set forth otherwise in the Confidentiality Agreement, (a) no past, present, or future stockholder, member, partner officer, director, manager, employee, incorporator, agent, attorney, or Representative of the Acquired Companies or the Seller or any of their respective Affiliates and (b) no past, present, or future stockholder, member, partner officer, director, manager, employee, incorporator, agent, attorney, or Representative of the Buyer or its Affiliates shall have be deemed to (i) have made any representations or warranties, express or implied, in connection with the Transactions, or (ii) have any personal Liability to the Buyer for any obligations or Liabilities of any Party under this Agreement for any claim based on, in respect of, or by reason of, the Transactions.

5

Except to the extent expressly set forth otherwise in the Confidentiality Agreement, all claims, obligations, liabilities or cause of action (whether in Contract or in tort, in law or in equity) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution or performance of this Agreement, may be made only against the Parties to this Agreement. It is further understood that any certificate or certification contemplated by this Agreement and executed by an officer of a Party shall be deemed to have been delivered only in such officer's capacity as an officer of such Party (and not in his or her individual capacity) and shall not entitle any Party to assert a claim against such officer in his or her individual capacity.

According to the EPA, all claims arising under the EPA are only permitted against a contracting party (*i.e.*, Buyer and Seller), including claims for tort and fraud. This provision controls Counts I, II, and III against non-seller defendants.

Schedule 1 of the EPA defines "Affiliate" as "any other Person directly or indirectly controlling, controlled by or under common control with such first Person within the meaning of the Securities Exchange Act of 1934, as amended." Prudential is an "Affiliate" under this definition. Section 8.11 of the EPA excludes representations by Affiliates.

Section 6.1(b) of the EPA regarding indemnification states:

[T]he Buyer, each of its Affiliates (including the Acquired Companies), and each of its respective successors, assigns, officers, directors, managers, members, equityholders, employees, and agents (collectively, the "Buyer Indemnitees" and each, a "Buyer Indemnitee"), shall be indemnified by the Seller from and against any Loss

6

suffered or incurred by any such Buyer Indemnitee arising resulting from or based upon[] any inaccuracy in or breach of any representation or warranty of the Seller contained in ARTICLE III or ARTICLE IV of this Agreement; provided that, other than with respect to Losses arising from Fraud or Losses arising out of a breach of any Seller Fundamental Representations, there shall be no indemnification for Liability under Section 6.1(b), unless the aggregate of all Losses arising thereunder for which indemnification Liability would, but for this proviso, exist exceeds $3,225,000 Dollars, and then only to the extent of any such excess[.]

Section 6.3(a) of the EPA states that a party first must seek recovery from the Warranty Insurance Policy before seeking indemnity from the seller. Under Section 6.3(g), a party may seek indemnification for claims based on fraud without first seeking recovery from the Warranty Insurance Policy.

Section 2.6(b) of the EPA explains that Buyer may not rely on representations made outside the contract, stating:

The Buyer acknowledges to the Seller that, except for the representations and warranties that are expressly set forth in ARTICLE III OR ARTICLE IV (as modified by the Disclosure Schedules) or in the Seller Release, the Acquired Company Release, the Seller Restrictive Covenant Agreements, or the certificates delivered to the Buyer by the Seller pursuant to Sections 7.1(f) through (h), (i) it is relying on its own investigation and analysis in entering into both the Transaction Documents and the Transactions; (ii) neither the Seller nor any of the Acquired Companies nor any of the respective Affiliates or Representatives of the Seller or the Acquired Companies, has made, and the Buyer is not relying on, any other representation or warranty, express or implied, of the Seller or the Acquired Companies or any of the respective

7

Affiliates or Representatives of the Seller or the Acquired Companies, with respect to the Seller or the Acquired Companies, including any representation or warranty as to (x) any information provided or made available to the Buyer or any of its Affiliates or Representatives, including the accuracy or completeness of any of such information, including the information set forth in the Confidential Discussion Materials and the Evaluation Materials and (y) any financial projection, forecast, budget or estimate provided or made available to the Buyer or any of its Affiliates or Representatives with respect to revenues, margins, backlogs, costs, expenses, income or profitability of the Acquired Companies; and (iii) none of the information and materials described in clause (ii), except as otherwise expressly represented in ARTICLE III or ARTICLE IV herein or in the Exhibits hereto, the Seller Release, the Acquired Company Release, the Seller Restrictive Covenant Agreements, or the certificates delivered to the Buyer by the Seller pursuant to Sections 7.1(f) through (h), shall form the basis of any Action or Proceeding (including under ARTICLE VI) against any of the acquired Companies or the Seller or any of the respective Affiliates or Representatives of the Acquired Companies or the Seller with respect thereto or with respect to any related matter.

Section 2.6(d) of the EPA states that "nothing in this Agreement . . . shall limit or otherwise restrict or be used as a defense in the event of Fraud."

Section 4.25 of the EPA, regarding disclaimer, states:

Except as otherwise specifically provided in ARTICLE III or ARTICLE IV (as modified by the Disclosure Schedules), the Purchased Equity is being acquired as is, and the Buyer is entering into this Agreement and the Purchased Equity is being acquired AS IS WITHOUT ANY OTHER EXPRESSED OR IMPLIED WARRANTY and neither the Seller, nor any of the Acquired Companies, nor any of its or their directors,

8

managers, officers, employees, stockholders, members, agents, Affiliates or Representatives thereof, nor any other Person, has made or shall be deemed to have made any representation or warranty to the Buyer, express or implied, at Law or in equity, with respect to the Seller, the Acquired Companies, the Business or the assets, Liabilities, results of operations or financial condition of the Acquired Companies, including any representations and warranties as to the accuracy or completeness of any Evaluation Material or any other information provided, delivered, or made available to the Buyer or any of its Affiliates or Representatives pursuant to the Confidentiality Agreement or as to the future sales, revenue, profitability, or success of the Business, or any representations or warranties arising from statute or otherwise in Law, from a course of dealing or a usage of trade. All such other representations and warranties are expressly disclaimed.

Section 8.13 provides the integration clause:

This Agreement (including any Exhibit or Schedule attached hereto) and the Transaction Documents contain the entire agreement and understanding among the Parties hereto with respect to the subject matter hereof and, except as explicitly set forth herein, supersede all prior and contemporaneous oral and written agreements and understandings relating to such subject matter. There are no promises, representations, warranties, covenants, or undertakings with respect to this Agreement (including any Exhibit or Schedule attached hereto) and the Transaction Documents and the events giving rise thereto other than those expressly set forth herein and therein.

## Secondary Liability Case Precedent

### Background Legal Context

In *ABRY Partners V, L.P. v. F & W Acquisition LLC*[5] and its progeny, Delaware courts have grappled with the balance between contractual freedom and an intolerance for fraud.[6] "Delaware has developed a body of law that permits sophisticated parties contractually to shift the risks posed by post-closing fraud claims."[7] Two common contractual provisions that parties combine to allocate such risks are anti-reliance and non-recourse provisions.[8] An anti-reliance provision limits "the possibility of future claims of fraud or misrepresentation by contractually specifying what representations the parties are and are not making and relying upon."[9] Thus, "parties eliminate 'extra-contractual fraud claims while preserving 'intra-contractual' fraud claims."[10] A non-recourse provision limits the entities and people a claim may be brought against.[11] Therefore, the anti-reliance provision dictates "what" the alleged claim may rely upon to establish the fraud

---

[5] 891 A.2d 1032 (Del. Ch. 2006).

[6] *Id.* at 1055–59; *see e.g.*, *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *12-13 (Del. Super.) (explaining the balance between Delaware's public policy against fraud and contractual freedom).

[7] *Aveanna*, 2021 WL 3235739, at *13 (citing *EMSI Acquisition, Inc. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *8–9 (Del. Ch.)).

[8] *Id.* at *4, 13, 24.

[9] *Infomedia Grp., Inc. v. Orange Health Sols., Inc.*, 2020 WL 4384087, at *4 (Del. Super.).

[10] *Aveanna*, 2021 WL 3235739, at *13.

[11] *Id.* at 4, 24.

and the non-recourse provision dictates "who" that alleged claim may be brought against.

The EPA in the instant case has a similar structure. Through the anti-reliance language in the non-recourse and integration clauses of the EPA, the contracting parties agreed what representations and warranties were being relied upon in the agreement. The non-recourse clause established that the Buyer and Seller are the only entities that made any representations and warranties. If Buyer and Seller are the only entities that made any representations and warranties, then Prudential, Szejner, Ethier, and Bradshaw ("non-seller defendants") could not have made any misrepresentations. The non-recourse language also states that the only party against whom a claim may be brought is the Seller. According to non-seller defendants, any claims against them are barred by the anti-reliance and non-recourse provisions. The question the Court must decide is whether public policy against fraud should override the parties' contractual provisions as it pertains to Buyer's fraud claims against non-seller defendants.

"Commentators and courts have generally understood Delaware law to disregard non-recourse clauses where the parties purportedly insulated by those clauses were complicit in contractual fraud."[12] "Because of Delaware's strong

---

[12] *Online HealthNow, Inc. v. CIP OCL Invs., LLC*, 2021 WL 3557857, at *19 (Del. Ch.) (citing *Shenandoah Life Ins. Co. v. Valero Energy Corp.*, 1988 WL 63491, at *9 (Del. Ch.); *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *11 (Del. Super.); *LaSalle Nat.*

public policy against intentional fraud, a knowingly false contractual representation can form the basis for a fraud claim, regardless of the degree to which the agreement purports to disclaim or eliminate tort remedies."[13]  Delaware law disregards "non-recourse clauses where the parties purportedly insulated by those clauses were complicit in contractual fraud."[14]

"The speaker who makes a false representation is, of course, accountable for it."[15]  "'[A] corporate officer can be held personally liable for the torts he commits and cannot shield himself behind a corporation when he is a participant.'"[16]  "'[A]n officer actively participating in the fraud cannot escape personal liability on the ground that the officer was acting for the corporation.'"[17]

---

*Bank v. Perelman*, 141 F. Supp. 2d 451, 461 (D. Del. 2001); *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 793 (Del. Ch. 1992); *Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, 1988 WL 5492, at *3 (Del. Ch.); Kling & Nugent § 15.02[2] n.31 ("Unless fraud is present, a court will generally enforce the clear expression of the parties' intent")).

[13] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 136–37 (Del. Ch. 2009).

[14] *Online HealthNow,* 2021 WL 3557857, at *19.

[15] *Prairie Cap. III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 59 (Del. Ch. 2015) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983) (noting that the first element of a common law fraud claim is "a false representation, usually one of fact, made by the defendant"); *accord* Restatement (Second) of Torts § 525 (1977) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability . . . .")).

[16] *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *12 (Del. Ch.) (quoting *Stonington Partners, Inc. v. Lernout & Houspie Speech Prods., N.V.*, 2002 WL 31439767, at *8 n. 27 (Del.Ch.)).

[17] *Prairie Cap.*, 132 A.3d at 60 (quoting 3A William Meade Fletcher, Cyclopedia of the Law of Corporations § 1135, at 273–76 (perm. ed., rev. vol. 2011)).

*ABRY and its Progeny*

In *ABRY*, the buyer alleged that the seller and company management manipulated financial statements to fraudulently induce the buyer to purchase the company.[18] The buyer sought rescission of the transaction.[19] The agreement at issue in *ABRY* did contain a non-recourse provision, even though the non-recourse provision was not directly referenced in the case.[20] The Court found that Delaware's public policy did not allow the Seller to insulate itself from fraud and denied Seller's motion to dismiss.[21] The *ABRY* Court did not directly address the impact of its holding on the remaining defendants also named in the fraud claim, who were not signatories to the agreement.[22] However, by denying the Seller's motion to dismiss, the Court "implicitly rejected the argument that a non-recourse provision will operate to insulate a [non-signatory] party from liability when that party facilitated the target's lies."[23]

---

[18] *ABRY*, 891 A.2d at 1038.

[19] *Id.* at 1040.

[20] *ABRY*, C.A. No. 1756-VCS, D.I. 15 (Tab 3, Part 4), § 11.10 ("Notwithstanding anything that may be expressed or implied in this Agreement, the Acquiror agrees and acknowledge that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any current or future director, officer, employee, general or limited partner of member of the Selling Stockholder or of any Affiliate or assignee thereof .... it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any current or future officer, agent or employee of the Selling Stockholder ... for any obligation of the Selling Stockholder or of any Affiliate or assignee thereof ... "); *see also Online HealthNow*, 2021 WL 3557857, at *14.

[21] *ABRY*, 891 A.2d at 1064–65.

[22] *See id.* at 1036.

[23] *Online HealthNow*, 2021 WL 3557857, at *14.

The *ABRY* Court found that a seller may not "insulate itself from the possibility that [a] sale would be rescinded if the [b]uyer can show either: 1) that the [s]eller knew that the [c]ompany's contractual representations and warranties were false; or 2) that the [s]eller itself lied to the [b]uyer about a contractual representation and warranty."[24]  Other Delaware Courts "have endorsed *ABRY's* holding that a 'seller can be liable for the false contractual representations of "the company" if the buyer adequately pleads the seller's knowledge of the company's misrepresentations.'"[25]

In *Express Scripts, Inc. v. Bracket Holdings Corp.*,[26] the Delaware Supreme Court explained that an agreement which limited the buyer's remedy for fraud was enforceable because the agreement specifically did not insulate the seller from "deliberate fraud."[27]  "[A] contracting party cannot, as a matter of public policy, 'limit . . . exposure for its own conscious participation in the communication of lies to the Buyer . . . .'"[28]  Thus, the Delaware Supreme Court clarified that *contracting parties* may not insulate themselves from deliberate, intentional fraud.[29]

---

[24] *ABRY*, 891 A.2d at 1064.

[25] *Online HealthNow*, 2021 WL 3557857, at *13 (quoting *Aveanna*, 2021 WL 3235739, at *16); *see also Prairie Cap.* 132 A.3d at 61 (holding individual defendants "Fortin and Vancura can be held liable for fraudulent contractual representations made by the Company because the Counterclaim sufficiently alleges that they knew that the representations were false.").

[26] 248 A.3d 824 (Del. 2021).

[27] *Id.* at 831–32.

[28] *Id.* at 830 (quoting *ABRY*, 891 A.2d at 1061, 1064).

[29] *Id.*

14

The issue in the instant case is not whether the Seller may insulate itself (as a contracting party) from fraud—it cannot—but whether the non-recourse provision may insulate other participants in the transaction from fraud liability (*i.e.*, non-seller defendants). The *ABRY* court established that contracting parties may not insulate themselves from fraud. The *ABRY* Court did not resolve whether other participants in the transaction may be shielded from fraud liability through contractual provisions.

*The EPA's Non-Recourse and Anti-Reliance Provisions*
*Do Not Bar Plaintiff's Fraud Claim*

In *River Valley Ingredients, LLC v. American Proteins, Inc.*,[30] company executives were included in the fraud claim.[31] The Court found that it was "reasonably conceivable" that the non-signatory parties were "connected to, and liable for, the representations made in the APA."[32] However, the Court in that case was not asked to consider whether the APA limited claims to contracting parties in a non-recourse provision.

In *Prairie Capital III, L.P. v. Double E Holdings Corp.*,[33] the Court concluded that it was "reasonably conceivable that [two corporate officers (one of which was also a board member)] [could] be held liable for fraudulent contractual

---

[30] 2021 WL 598539 (Del. Super.).
[31] *Id.* at *4.
[32] *Id.*
[33] 132 A.3d 35 (Del. Ch. 2015).

representations made by the Company because the Counterclaim sufficiently allege[d] that they knew that the representations were false."[34]  However, the Court in this case also apparently was not asked to consider a contractual provision limiting claims to contracting parties through a non-recourse provision.

In *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*,[35] the Court addressed contractual fraud.[36]  The parties agreed to provisions that excluded the buyer from relying "on extra-contractual representations."[37]  The provisions also "bar[red] fraud claims premised on statements that [were] not expressly contained within the [agreement]."[38]  The Court concluded the fraud claims were not barred by the agreement's anti-reliance language because the alleged fraud was based on intra-contractual representations.[39]  The parties also agreed to a non-recourse provision that specifically allowed for fraud claims against Affiliates.[40]  Even though the Affiliate was not a party to the agreement, the fraud claim could proceed against the Affiliate because the non-recourse provision did not exclude Affiliates.[41]

In contrast, the non-recourse provision in the instant case does not specifically allow for fraud claims against Affiliates.  Instead, the non-recourse

---

[34] *Id.* at 61.
[35] 2021 WL 3235739 (Del. Super.).
[36] *Id.* at *12–15.
[37] *Id.* at *14.
[38] *Id.* at *14.
[39] *Id.* at *15.
[40] *Id.* at *4.
[41] *Id.* at *24.

provision in the instant case excludes Affiliates from liability.  Therefore, *Aveanna* is distinguishable.

In *Harland Clarke Holdings Corporation v. Milken*,[42] the Delaware District Court found that a non-recourse clause prevented the plaintiff from bringing a fraud claim against a non-recourse party.[43]  In that case, the non-recourse clause explicitly stated that claims could only be brought against the Guarantor or the Seller.[44]  Because the person at issue, Milken, was not the Guarantor or the Seller, he was a non-recourse party and immune from suit for fraud.[45]  The Court granted the motion for summary judgment.[46]

However, the fraud claim in *Harland* was based on extra-contractual representations.[47]  The instant case is based solely on intra-contractual representations.  The *Harland* Court indicated the importance of distinguishing between extra-contractual fraud and intra-contractual fraud, stating: "Contracts between sophisticated parties may include provisions insulating the parties from 'fraud claims based on representations made *outside* of a merger agreement— which can be disclaimed through non-reliance language.'"[48]  The Court then found

---

[42] 2015 WL 12868204 (D. Del.), *aff'd*, 646 F. App'x 223 (3d Cir. 2016).
[43] *Id.* at *2.
[44] *Id.* at *1.
[45] *Id.* at *2.
[46] *Id.* at *4.
[47] *Id.* at *2, 3.
[48] *Id.* at *3 (quoting *RAA Management, LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 116–18 (Del. 2012)) (emphasis in original).

the plaintiff's extra-contractual claims not permissible because various contractual provisions prohibited claims based on extra-contractual language.[49]

The reasoning from *Harland* is not dispositive in the instant case because: (1) the *Harland* Court relied on extra-contractual representations combined with anti-reliance and non-recourse provisions; and (2) the decision was on summary judgment, rather than at the motion to dismiss stage. Because *Harland* is a 2015 case, the District Court also did not have the benefit of more recent Delaware opinions that instruct on interpreting these contractual provisions, like *Online HealthNow, Inc. v. CIP OCL Investments, LLC.*[50]

*Online HealthNow* is the case most factually like the instant case. In *Online HealthNow*, the Court of Chancery addressed *ABRY* and whether anti-reliance and non-recourse provisions worked together to bar a plaintiff's intra-contractual fraud claim.[51] The non-recourse provision in *Online HealthNow* provided:

> [T]he [agreement] may only be enforced against "the Parties and their respective successors and permitted assigns"; claims arising out of the [agreement] may only be asserted against "the Persons that are expressly identified as Parties and their respective successors and permitted assigns"; and "no officer, director, partner, manager, equityholder, employee or Affiliate of any Party ... will have any liability or obligation with respect to [the agreement] or with respect to any claim or cause of action (whether in contract, tort or otherwise)" arising out of or

---

[49] *Id.*
[50] 2021 WL 3557857 (Del. Ch.).
[51] *Id.* at *1, 11.

related to the [agreement] "(including a representation or warranty made in connection with [the agreement] or as an inducement to enter into [the agreement])."[52]

CIP OCL was the Seller as identified in the agreement.[53] CIP Capital was a private equity fund that "directly owned (in part) and controlled CIP OCL."[54] Plaintiffs argued "that it expressly relied on the allegedly fraudulent misrepresentations made by CIP OCL [seller] and [that] *ABRY Partners* [did] not permit CIP Capital to take cover behind a non-recourse provision if it knowingly participated in the alleged contractual fraud."[55] Defendants countered "that CIP Capital . . . [could not] be held liable for CIP OCL's contractual representations under the [agreement]'s non-recourse and anti-reliance clauses."[56] Delaware law disregards "non-recourse clauses where the parties purportedly insulated by those clauses were complicit in contractual fraud."[57] Even though the agreement dictated that only CIP OCL (Seller) made any representations and warranties, "'the scope of a claim for contractual fraud [swept] more broadly[]' to cover those who *knew* that such representations were false."[58]

---

[52] *Id.* at *5.
[53] *Id.* at *2.
[54] *Id.* at *3.
[55] *Id.* at *19.
[56] *Id.*
[57] *Id.*
[58] *Id.* at *13, 19 (quoting *Prairie Cap.*, 132 A.3d at 60) (emphasis in original).

The *Online HealthNow* Court determined that the non-recourse provision in the parties' agreement did not bar the plaintiffs' contractual fraud claim against a non-signatory party.[59] The plaintiff sufficiently pled that the non-signatory party (CIP Capital) knew and facilitated fraudulent misrepresentations in the agreement.[60] CIP Capital, as a private equity fund that controlled the seller (CIP OCL), was not insulated from the plaintiff's fraud claim.[61] Thus, a fraud claim may be brought against a non-signatory party who is knowingly complicit in the fraud, even though the combination of non-recourse and anti-reliance language in the contract stipulates a fraud claim could not otherwise be brought.[62]

The Court finds that *Online HealthNow* controls. The case precedent ensures that contracting parties cannot insulate themselves from fraud.[63] However, *Online HealthNow* determined that non-contracting parties also may expose themselves to fraud liability.[64] Public policy against fraud may defeat anti-reliance and non-recourse contractual language at the motion to dismiss stage in litigation, if the plaintiff can adequately plead that a non-signatory party was knowingly

---

[59] *Id.* at *18–19.
[60] *Id.* at *20.
[61] *Id.*
[62] *Online HealthNow* also concluded the agreement's survival clause did not bar the plaintiff's fraud claim. *Id.* at *18. The Court did not indicate that the survival clause in any way affected its analysis concerning the non-recourse and anti-reliance provisions at issue.
[63] *See Express Scripts,* 248 A.3d at 830 ("[A] contracting party cannot, as a matter of public policy, 'limit . . . exposure for its own conscious participation in the communication of lies to the Buyer . . . .'" (quoting *ABRY*, 891 A.2d at 1061, 1064)).
[64] *Online HealthNow*, 2021 WL 3557857, at *20.

complicit when a contracting party made fraudulent representations in a contract. Therefore, the fraud claims against non-seller defendants are not necessarily barred by the non-recourse and anti-reliance language in the EPA.

### *Fraud Allegations*

Buyer alleges: (1) fraudulent inducement against all Defendants; (2) aiding and abetting fraud against non-seller defendants; and (3) civil conspiracy against all Defendants.

Superior Court Civil Rule 9(b) requires that fraud claims satisfy a heightened pleading standard. "In all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."[65]

> The factual circumstances that must be stated with particularity refer to the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation. Although Rule 9(b) provides that "knowledge ... may be averred generally," where pleading a claim of fraud has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pled facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it.[66]

---

[65] Del. Super. Ct. Civ. R. 9(b).
[66] *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 208 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007).

"'Essentially, . . . the plaintiff must allege circumstances sufficient to apprise the defendant of the basis of the claim.'"[67]

*Fraudulent Inducement Claim*

A fraudulent inducement claim requires that the following elements be well-pled:

> (i) a false representation, usually one of fact, made by the defendant;
> (ii) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
> (iii) an intent to induce the plaintiff to act or to refrain from acting;
> (iv) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and
> (v) damage to the plaintiff as a result of such reliance.[68]

Buyer alleges that Sections 4.23, 4.5(b)(ii) and 3.7 of the EPA were false intra-contractual representations made to induce Buyer to execute the EPA.

Section 4.23 of the EPA represents the following:

> No Material Vendor has cancelled, terminated or materially diminished its business relationship with the applicable Acquired Company or notified the applicable Acquired Company in writing (or, to the Knowledge of the applicable Acquired Company, orally) of its intent to cancel, terminate or materially diminish its business relationship with the applicable Acquired Company, including the material modification of any terms (whether

---

[67] *Aveanna*, 2021 WL 3235739, at *22 (quoting *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003)).
[68] *Id.* at *21.

22

related to the payment, price, quantity or otherwise) or its relationship in an adverse manner.

Section 4.5(b)(ii) represents that there had been no Company Material Adverse Changes occurring between December 31, 2020 and the Closing.

Section 3.7(iii) of the EPA represents:

> [T]o the Seller's Knowledge, no other party to any such Seller Business Contract is in material breach or material default of such Seller Business Contract. No party to any Seller Business Contract has disputed, renegotiated, modified, canceled, failed to renew, renewed on materially different terms, terminated, or, to the Seller's Knowledge, threatened to dispute, renegotiate, modify, cancel, fail to renew, renew on materially different terms, or terminate any such Seller Business Contract.

Buyer argues: (1) the LSC Letter constitutes notice from a Material Vendor that it intends to cancel, terminate, or materially diminish its business relationship with the Acquired Companies under Section 4.23; (2) the operational and financial impacts of LSC's alteration of its business relationship with the Acquired Companies also constitute a Company Material Adverse Change under Section 4.5(b)(ii); and (3) the invocation of the Force Majeure provision and planned reduction of circulation described in the LSC Letter constitutes a cancellation or modification of a Seller Business Contract under Section 3.7.

The LSC Letter refers to labor shortages that would result in circulation reductions, schedule delays, and additional incremental charges estimated to be $225,672.12. LSC was one of the Acquired Companies' primary vendors used for

printing catalogs. Because it is alleged that approximately 88% of the Acquired Companies' revenue comes from catalog sales, a reduction in printing services was a major concern for Buyer. Therefore, a failure to disclose the LSC Letter allegedly would have constituted a deliberate false representation and failure to disclose.

Buyer alleges that Ethier and Bradshaw—and by extension, Seller—received the LSC Letter via email on September 24, 2021. Buyer also argues that it can reasonably be inferred that Prudential and Szejner were in a position to know about the LSC Letter.

Non-seller defendants rely on the fraudulent reliance claims being barred by the non-recourse and anti-reliance provisions as the basis for their motion to dismiss. The non-seller defendants and Seller also argue the fraudulent inducement claim fails for failure to plead separate fraud damages from the indemnification claim.

The Court previously has found that the non-recourse and anti-reliance provisions do not bar Buyer's claims against non-seller defendants.

### Buyer Met Pleading Standard for Fraudulent Inducement Concerning Prudential, Szejner, Seller, Ethier, and Bradshaw

The First Amended Complaint alleges (1) that Seller, Ethier, and Bradshaw, Szejner, and Prudential made a false representation to Buyer concerning the LSC Letter; and (2) that Ethier and Bradshaw received the LSC Letter via email on

24

September 24, 2021, three weeks before Closing the transaction. Because Seller, Ethier, and Bradshaw allegedly received the letter, Buyer has met the "knowledge" pleading requirement concerning Seller, Ethier, and Bradshaw.

The complaint contains no allegations regarding Prudential and Szejner's actual knowledge of the LSC Letter. Actual knowledge and deliberate misrepresentation distinguish contractual breach of representation and warranty claims from deliberate fraud claims. The Buyer did not allege that Prudential and Szejner had been copied on the email containing the LSC Letter, nor that Prudential and Szejner had obtained knowledge of the LSC Letter in another manner.

Although Buyer may plead knowledge generally, additional factual allegations are required for fraud.[69] Buyer alleged that Szejner—and therefore Prudential because Szejner was acting in his capacity as Managing Director[70]— was the "main driver" of the transaction, was at the forefront of all negotiations, was the primary member of the Project Dispatch Working Group, and directed

---

[69] *ABRY*, 891 A.2d at 1050 ("While knowledge may be pled generally, when a plaintiff pleads a claim of fraud that charges that the defendants knew something, it must allege sufficient facts from which it can reasonably be inferred that this 'something' was knowable and that the defendants were in a position to know it.").

[70] *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *12 (Del. Ch.) (quoting *Stonington Partners, Inc. v. Lernout & Houspie Speech Prods., N.V.*, 2002 WL 31439767, at *8 n.27 (Del.Ch.)); *see also Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) ("A corporate officer is individually liable for the torts [s]he personally commits and cannot shield h[er]self behind a corporation when [s]he is an actual participant in the tort.").

negotiations and drafts. Buyer also has alleged that Ethier and/or Bradshaw provided the LSC Letter to Szejner and discussed the LSC Letter's potential to derail the transaction. Based on these alleged facts, the Court reasonably can infer (for pleading purposes) that the LSC Letter was "knowable" to Szejner and Prudential. It is reasonable to infer that Szejner and Prudential also were in a position to know about the LSC Letter's existence at the time of the alleged misrepresentations because of their position in the Project Dispatch Working Group. Buyer is only required to put Szejner and Prudential on notice as to the basis of their claim. Thus, Buyer also met the "knowledge" pleading requirement in this case concerning Szejner and Prudential.

The representations concerning material vendors were in the EPA and therefore intended to induce the buyer to close the sale of the company.[71] As stated in the EPA, Buyer relied on the representations from the EPA in moving forward with the Closing of the transaction. Thus, Buyer has satisfied the particularity standard in pleading the first four fraudulent inducement elements.

---

[71] *See ABRY*, 891 A.2d at 1051 ("These financial statements were represented and warranted in the Agreement and were therefore intended to induce the Buyer to sign the Agreement and close the sale to purchase the Company.").

The last element of a fraudulent inducement claim that Buyer must plead is damages.[72] The fraud claims track and duplicate the breach of contract allegations. The fraud claims are repackaged breach of representation and warranty claims.

> Under Delaware law, a plaintiff bringing a claim based entirely upon a breach of the terms of a contract generally must sue in contract, and not in tort. . . . However, the same circumstances may give rise to both breach of contract and tort claims if the plaintiff asserts that the alleged contractual breach was accompanied by the breach of an independent duty imposed by law.[73]

"Under Delaware's pleading standard, a plaintiff's fraud claim 'may not simply "rehash" the damages allegedly caused by the breach of contract.'"[74] "[T]he relevant question is whether fraudulent inducement resulted in the plaintiff sustaining or incurring different damages from those of its breach of contract claim."[75] One way to cure a pleading alleging the same damages for fraudulent inducement that are alleged for breach of contract is to plead the claims in the alternative to one another.[76]

---

[72] *Cornell Glasgow, LLC v. La Grange Properties, LLC*, 2012 WL 2106945, at *8 (Del. Super.).
[73] *Data Mgmt. Internationale, Inc. v. Saraga*, 2007 WL 2142848, at *3 (Del. Super.).
[74] *Khushaim v. Tullow Inc.*, 2016 WL 3594752, at *6 (Del. Super.) (quoting *ITW Glob. Invs. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, 2015 WL 3970908, at *5 (Del.Super.)).
[75] *Firmenich Inc. v. Nat. Flavors, Inc.*, 2020 WL 1816191, at *9 (Del. Super.), *cert. denied*, 2020 WL 2193285 (Del. Super.), and *appeal refused*, 230 A.3d 901 (Del. 2020).
[76] *Ashland LLC v. Samuel J. Heyman 1981 Continuing Tr. for Heyman*, 2018 WL 3084975, at *14–15 (Del. Super.) (explaining that Ashland's fraudulent inducement claim, pleaded in the alternative, is not inconsistent with the contractual allegations, and that claims pleaded in the alternative are not duplicative because they will never "co-exist at final judgment"); *Firmenich*, 2020 WL 1816191, at *9 ("[D]uplicative damages will not bar parallel breach of contract and fraud in the inducement claims if the claims are pled in the alternative." (citing *Ashland*, 2018 WL 3084975, at *14–15)).

The Court finds that Buyer's alleged damages for fraudulent inducement and breach of contract are not subject to dismissal as duplicative, because they are pled in the alternative. At this stage of litigation the two claims may co-exist. The Court finds the fraudulent inducement claim against Seller, Ethier, Bradshaw, Prudential, and Szejner was pled with sufficient particularity under Superior Court Civil Rule 9(b).

*Aiding and Abetting Fraud*

A claim for aiding and abetting fraud must establish the following elements: "(i) underlying tortious conduct[;] (ii) knowledge[;] and (iii) substantial assistance."[77] "Like the pleading requirements for fraud, the knowledge element of an aiding and abetting claim under Delaware law can be averred generally."[78] It requires that the plaintiff plead facts from which it reasonably can be inferred that the defendants knew or were in a position to know of the underlying tortious conduct.[79] To show substantial assistance, "the secondary actor must have provided 'assistance . . . or participation' in aid of the primary actor's allegedly unlawful acts."[80]

---

[77] *Agspring Holdco, LLC v. NGP X US Holdings, L.P.*, 2020 WL 4355555, at *20 (Del. Ch.) (quoting *PR Acqs., LLC v. Midland Funding LLC*, 2018 WL 2041521, at *15 (Del. Ch.)).
[78] *Id.*
[79] *Id.*
[80] *In re Oracle Corp. Derivative Litig.*, 2020 WL 3410745, at *11 (Del. Ch.) (quoting Restatement (Second) of Torts § 876 cmt. d (1979)).

Bradshaw and Ethier argue that the aiding and abetting fraud claims should be dismissed pursuant to the non-recourse provision and because of the lack of an actionable underlying tort. Prudential and Szejner similarly argue the fraud claim should be dismissed because of the lack of an actionable tort.

The Court previously has found that the non-recourse provision does not bar claims for fraud under the circumstances presented in this case. The underlying tort of fraudulent inducement also was properly pled.

Bradshaw and Ethier also argue that the intra-corporate conspiracy doctrine bars their claim for aiding and abetting. "[O]fficers and agents cannot aid and abet their principal or each other in the commission of a tort."[81] Buyer alleges that Bradshaw, Ethier, Prudential, and Szejner all aided and abetted Seller. The intra-corporate conspiracy doctrine would apply to Bradshaw and Ethier—as officers of Seller. The intra-corporate conspiracy doctrine does not apply to Prudential and Szejner because Prudential and Szejner are not officers or agents of Seller.

Buyer alleges that Szejner—and therefore Prudential because Szejner was acting in his capacity as Managing Director[82]—was the "main driver" of the transaction, was at the forefront of all negotiations, was the primary member of the

---

[81] *Cornell Glasgow*, 2012 WL 2106945, at *11.

[82] *Bay Ctr. Apartments Owner,* 2009 WL 1124451, at *12 (quoting *Stonington Partners, Inc. v. Lernout & Houspie Speech Prods., N.V.*, 2002 WL 31439767, at *8 n.27 (Del.Ch.)); *see also Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) ("A corporate officer is individually liable for the torts [s]he personally commits and cannot shield h[er]self behind a corporation when [s]he is an actual participant in the tort.").

Project Dispatch Working Group, and directed negotiations and drafts. Buyer has also alleged that Ethier and/or Bradshaw provided the LSC Letter to Szejner and discussed the LSC Letter's potential to derail the transaction.

Based on these alleged facts, the Court reasonably can infer that the LSC Letter was "knowable" to Szejner and Prudential. For pleading purposes, it is reasonable to infer that Szejner and Prudential also were in a position to know about the LSC Letter's existence at the time of the alleged misrepresentations. It is also reasonable to infer that Prudential and Szejner participated and aided Seller through the Project Dispatch Working Group in the alleged fraudulent inducement.

The Court finds the aiding and abetting claim must be dismissed as to Bradshaw and Ethier on the basis of the intra-corporate conspiracy doctrine. The Court finds that the motion to dismiss the aiding and abetting fraud claim must be denied as to Prudential and Szejner.

*Civil Conspiracy to Fraudulently Induce Buyer*

"The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties."[83] "Since conspiracy requires an agreement or understanding to commit a wrong against another, its commission necessarily 'involves some

---

[83] *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at \*10 (Del. Ch.).

mutual mental action coupled with an intent to commit the act which results in the injury.'"[84] "Plaintiffs do not need to prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirators."[85] All that is needed to survive a motion to dismiss is a reasonable inference that each member was part of the conspiracy.[86]

Seller, Bradshaw, Ethier, Szejner, and Prudential again rely on the fact that an underlying tort was not properly pled, thus the civil conspiracy claim should be dismissed. The Court previously has found that Buyer properly pled an underlying tort.

Prudential and Szejner also argue that Buyer failed to allege that Prudential and Szejner entered an agreement to cooperate. It can reasonably be inferred from the alleged facts that Szejner and Prudential were part of the alleged conspiracy. Buyer alleged that Szejner—and therefore Prudential because Szejner was acting in his capacity as Managing Director[87]—was the "main driver" of the transaction, was at the forefront of all negotiations, was the primary member of the Project

---

[84] *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *4 (Del. Super.).
[85] *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 806 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (citing *Empire Fin. Servs., Inc. v. Bank of N.Y.*, 900 A.2d 92, 97 n.16 (Del.2006)).
[86] *Id.*
[87] *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *12 (Del. Ch.) (quoting *Stonington Partners, Inc. v. Lernout & Houspie Speech Prods., N.V.*, 2002 WL 31439767, at *8 n. 27 (Del.Ch.)); *see also Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) ("A corporate officer is individually liable for the torts [s]he personally commits and cannot shield h[er]self behind a corporation when [s]he is an actual participant in the tort.").

31

Dispatch Working Group, and directed negotiations and drafts. Buyer has also alleged that Ethier and/or Bradshaw provided the LSC Letter to Szejner and discussed the LSC Letter's potential to derail the transaction. Buyer alleged that "Szejner told Ethier to tell the other executives, including Wurl, Zielecki and Bradshaw, that he (i.e. Szejner) wanted them to 'show confidence in q4,' to 'manage expectations around y/e ebitda,' and warned them that 'Hedging now is premature and will erode confidence.'" These combined facts create a reasonable inference that Prudential, Szejner, Bradshaw, Ethier, and Seller formed an agreement to cooperate in the alleged fraudulent inducement.[88]

Therefore, the Court finds that the underlying tort of fraudulent inducement would meet the second pleading requirements for civil conspiracy.

However, the last element that Buyers must plead for civil conspiracy is damages. Buyer alleges the same damages for civil conspiracy that it alleges for fraudulent inducement and breach of contract. It does not delineate separate damages specifically ascribed to the alleged conspiracy. Therefore, the Court finds

---

[88] Unlike the aiding and abetting claim, the intra-corporate conspiracy doctrine does not bar this claim. The pleading for the aiding and abetting claim specifically stated that Prudential, Szejner, Bradshaw, and Ethier aided and abetted Seller. The civil conspiracy allegations state that Seller, Prudential, Szejner, and Ethier entered into a confederation or combination to fraudulently induce Buyer. This permits those who are not protected by the intra-corporate conspiracy doctrine (Prudential and Szejner) to conspire with those who are protected (Seller, Ethier, and Bradshaw). Thus, while Bradshaw and Ethier cannot conspire with Seller, Prudential and Szejner may form an agreement to conspire with Bradshaw and Ethier—and Seller may form an agreement to conspire with Prudential and Szejner.

these alleged damages are impermissibly duplicative.[89]  Without satisfying the

damages pleading requirement for civil conspiracy, the claim must be dismissed.

### *Indemnification for Breach of Representations and Warranties*

Section 6.3(a) of the EPA states that a party first must seek recovery from

the Warranty Insurance Policy before seeking indemnity from the seller.  Under

Section 6.3(g), a party may seek indemnification for claims based on fraud without

first seeking recovery from the Warranty Insurance Policy.  Section 6.3(g) of the

EPA states:

> As between the Parties and any Indemnified Person and
> Indemnifying Person, the sole source to satisfy any and
> all indemnification claims of the Buyer or any
> Indemnified Person pursuant to Section 6.1(b) herein
> shall be under the Warranty Insurance Policy, except for
> (i) such indemnification claims based on Fraud . . . .

The indemnification claim for breach of representations and warranties is based on

the allegations from the fraudulent inducement claim, and is pled in the alternative

to the fraudulent inducement claim.  The Court previously has found that the

fraudulent inducement claim may proceed.  Therefore, the Court finds that Section

6.3(g) of the EPA allows Buyer to bring an indemnification claim without first

pursuing a claim under the Warranty Insurance Policy.

---

[89] Defendants did not raise the damages argument concerning civil conspiracy.

## CONCLUSION

The Court finds that public policy considerations against fraud may defeat anti-reliance and non-recourse contractual language at the motion to dismiss stage in litigation, if the plaintiff can adequately plead that a non-signatory party was knowingly complicit when a contracting party made fraudulent representations in a contract. Therefore, the fraud claims against non-seller defendants are not necessarily barred by the non-recourse and anti-reliance language in the EPA.

The Court finds that Buyer's alleged damages for fraudulent inducement and breach of contract are not subject to dismissal as duplicative, because they are pled in the alternative. At this stage of litigation, the two claims may co-exist. The Court finds that the fraudulent inducement claim against Seller, Ethier, Bradshaw, Prudential, and Szejner was pled with sufficient particularity under Superior Court Civil Rule 9(b).

The Court finds the aiding and abetting claim must be dismissed as to Bradshaw and Ethier on the basis of the intra-corporate conspiracy doctrine. The Court finds that the motion to dismiss the aiding and abetting fraud claim must be denied as to Prudential and Szejner.

The Court finds that the civil conspiracy claim must be dismissed for failure to properly plead non-duplicative damages.

34

The Court finds that Section 6.3(g) of the EPA allows Buyer to bring an indemnification claim on the basis of fraud, without first pursuing a claim under the Warranty Insurance Policy.

**THEREFORE**, Amerimark Holdings, LLC, Marcus Bradshaw, and Mark Ethier's Motion to Dismiss is hereby **GRANTED IN PART AND DENIED IN PART.** Prudential Capital Partners II, L.P. and Stephen Szezner's Motion to Dismiss is hereby **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED.**

*/s/ Mary M. Johnston*
The Honorable Mary M. Johnston

35